MARKETING DISPLAYS, INCOR-
PORATED, Plaintiff–Appel-
lee/Cross–Appellant,

v.

TRAFFIX DEVICES, INCORPO-
RATED, Defendant–Appel-
lant/Cross–Appellee.

Nos. 97–1148, 97–2096 and 97–2097.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 21, 1999.

Decided Dec. 29, 1999.

Frank A. Angileri, Brooks & Kushman, Southfield, MI, John A. Artz (argued and briefed), Lyon & Artz, Southfield, MI, for Plaintiff–Appellee/Cross–Appellant.

Richard W. Hoffmann (briefed), Jeanne–Marie Marshall (argued and briefed), Craig A. Baldwin, Reising, Ethington, Barnes, Kisselle, Learman & McCullock, Troy, MI, Irwin Alterman (argued and briefed), Kemp, Klein, Umphrey & Endelman, Troy, MI, for Defendant–Appellant/Cross–Appellee.

Before: BOGGS and DAUGHTREY, Circuit Judges; and MCKINLEY,* District Judge.

* The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

## OPINION

BOGGS, Circuit Judge.

This consolidated appeal concerns three related but distinct disputes between the parties. Marketing Devices, Inc. (owner of the WindMaster trademark) claims that TrafFix Displays, Inc. (owner of the Wind-Buster trademark) has infringed its trademark, infringed its trade dress, and violated federal unfair competition laws in the process. TrafFix denies these charges, and counterclaims that MDI, by aggressively pursuing sham litigation to extend its patent, has violated § 2 of the Sherman Antitrust Act, which prohibits attempts to monopolize. MDI's unfair competition claim turns on the same evidence as its trademark and trade dress claims, so the three real disputes raised for consideration are 1) infringement of the WindMaster trademark, 2) infringement of the Wind-Master trade dress, and, should those claims prove sufficiently unfounded, 3) MDI's alleged attempt to monopolize through sham litigation. TrafFix appeals the district court's order granting summary judgment against TrafFix and enjoining use of its infringing trademark, as well as the dismissal of its antitrust counterclaim. MDI cross-appeals the district court's grant of summary judgment to TrafFix on MDI's trade dress and federal unfair competition claims.

We find no reason to disturb the district court's order permanently enjoining use of the WindBuster trademark. However, because we believe that MDI established genuine issues of material fact on its trade dress and unfair competition claims, we reverse the district court's summary judgment on those issues. In light of these holdings, we affirm summary judgment for MDI on the antitrust counterclaim brought by TrafFix.

## I

MDI manufactures a number of different products for sale to the highway construction industry. In particular, it markets a popular, wind-resistant, mobile, traffic-sign stand under the brand name WindMaster, which was trademarked July 5, 1977. The WindMaster sign's design depends in part on patents for a dual-spring base that helps the sign resist windy conditions. MDI's president Robert Sarkisian developed the patented sign stand in the mid–1960s, and the last relevant patent expired on May 16, 1989, seventeen years after its issuance. TrafFix also sells traffic safety products to the highway construction industry. Knowing that the technology protected by a patent becomes available to the public after the patent expires, TrafFix owner and president Jack Kulp sent an MDI sign to Korea to be reverse engineered into a product he could sell in competition with MDI. Before founding TrafFix, Kulp had distributed WindMaster signs as an employee at another company. TrafFix brought its sign to market in the fall of 1994, but did not begin using the brand name WindBuster until mid–1995. Kulp says he chose the name WindBuster, suggested by a business associate, because it connoted wind resistance, he liked it, and it sounded "like breaking and busting a bronco...."

Before using the name, Kulp directed a patent attorney to conduct a trademark search to determine the availability of WindBuster as a trademark for traffic signs. Attorney Donald Stout concluded in a January 11, 1994 opinion letter that TrafFix had a "reasonably good chance" of registering WindBuster despite the prior marks of WindMaster and WindFlex for traffic-sign stands. He believed that there was not any confusing similarity between WindBuster and the other marks, especially given the "specialized field" and "discriminating" consumer base. TrafFix then filed an application to register WindBuster as a trademark with the United States Patent and Trademark Office on February 10, 1994. The examining attorney found no similar registered mark that would bar registration. The PTO published the proposed new trademark in its Official Gazette on March 14, 1995, to provide an opportunity for anyone to object to the mark's use. No one objected within the

post-publication period prescribed by law. Thus, the PTO allowed the WindBuster trademark on June 21, 1995. The trademark registration for WindBuster issued on January 9, 1996.

In the meantime, MDI quickly became aware of the new trademark and filed its initial complaint in this case on July 11, 1995. In an order dated January 13, 1997, the district court granted summary judgment to MDI on its trademark infringement claim, permanently enjoined TrafFix's use of the infringing mark, and dismissed TrafFix's antitrust counterclaim. Then, on June 12, 1997, the district court granted summary judgment to TrafFix, dismissing MDI's trade dress and unfair competition claims. The parties filed timely notices of appeal on the issues adverse to them, and the district court certified all liability issues as final for appeal on September 11, 1997.

## II

■ This court reviews *de novo* the district court's grant of summary judgment as to trademark infringement and its issuance of a permanent injunction. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997). Because the district court granted summary judgment rather than conducting a trial on this issue, a *de novo* standard of review applies to the entire appeal of the trademark and trade dress claims. *See id.* at 279–80. Summary judgment on the antitrust counterclaim is likewise reviewed *de novo*, but this court reviews for abuse of discretion the district court's decision not to allow discovery on the antitrust counterclaim. *See Glen Eden Hosp., Inc. v. Blue Cross and Blue Shield of Mich.*, Inc., 740 F.2d 423, 428 (6th Cir.1984).

## III

■ As noted by the district court, to prevail on a motion for summary judgment in its Lanham Act trademark infringement claim, MDI must prove that the purportedly infringing mark is "likely to cause confusion" in prospective purchasers' minds. 15 U.S.C. § 1114; *See Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988); *See also Homeowners Group, Inc. v. Home Mktg. Specialists Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991) (identifying the ultimate question as "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way"); *Daddy's Junky Music*, 109 F.3d at 280 (calling the key question "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties"). Likelihood of trademark confusion can be a question of law appropriate for determination on a motion for summary judgment. *See WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983).

■ The Sixth Circuit has identified eight factors as informing the likelihood of confusion inquiry:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; [and]
8. likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir.1982), quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir.1979). None of these factors is a *sine qua non* for the plaintiff's case, so the defendant does not necessarily establish a genuine issue of material fact merely by disproving the existence of any one—or even a majority of—the factors. *See Wynn Oil*, 839 F.2d at 1186. Rather, summary judgment for the plaintiff is appropriate if, upon consideration of all factors, the district court determines that no reasonable jury could fail to find that confusion of the marks would be likely.

TrafFix argues that summary judgment is not appropriate whenever "there is a dispute regarding the underlying factors." That argument misconstrues the holding in *Homeowners*, where this court stated:

> To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those of the *Frisch's* factors which may be material in the context of the specific case.

*Homeowners*, 931 F.2d at 1107. This language does not indicate that any disputed factor is enough, because any one factor standing alone may not be material. Indeed, the district court is apt to find, as it did here, that at least one factor favors the nonmoving party. Since that does not prevent an overall finding of likelihood of confusion in the movant's favor, it would be illogical for a merely disputed factor to preclude summary judgment. *Homeowners* must be understood to mean that the nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue.

■ Without regard to the *Frisch's* factors, TrafFix claims its own registered mark earns a presumption against infringement by virtue of the PTO's allowing the WindBuster trademark. It cites no case law in direct support of this proposition. It cites an 1894 Supreme Court case holding that where the question of priority of invention in a patent case is doubtful, the decision of the patent office must control. *See Morgan v. Daniels*, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657 (1894). Even that case expressly states that the patent office's decision may be overcome by testimony "sufficient to produce a clear conviction that [it] made a mistake" *Id.* at 129, 14 S.Ct. 772. The other case cited by TrafFix says that the presumption of a patent's validity is a statutory presumption, that the constant burden (notwithstanding the presumption) is to convince the court of a patent's invalidity by clear evidence, and that no deference is due a PTO decision with respect to evidence the PTO did not consider. *See American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1360 (Fed.Cir.1984). None of this helps TrafFix. TrafFix argues for a procedural presumption (or at least a reasonable inference drawn in its favor) that the trademark examining attorney at the PTO actually examined the WindMaster mark and found that the WindBuster mark did not infringe it. But, as the district court noted, there is no evidence that the PTO considered the WindMaster mark, and the PTO might have made a mistake.

A brief review of the lower court findings on each of the *Frisch's* factors will demonstrate the validity of its legal conclusion that there is sufficient likelihood of confusion to warrant a permanent injunction against the WindBuster mark.

### A. Strength of the plaintiff's mark

TrafFix concedes the incontestable status of MDI's WindMaster trademark as to the goods listed in the registration certificate. The district court found that the product description in the registration certificate was broad enough to cover MDI's traffic signs, especially given the "virtually identical" language used in the certificate TrafFix received for its WindBuster mark. This factor clearly favors MDI.

### B. Relatedness of the goods

TrafFix does not contest on appeal the district court's finding that the parties' goods are related. Hence, this factor clearly favors MDI.

### C. Similarity of the marks

TrafFix relies on the PTO's registering of its own WindBuster trademark as sufficiently credible evidence of dissimilarity to create a genuine issue of material fact. The district court found that the WindMaster and WindBuster marks connote the same meaning and resemble one another in look and sound, especially given

the similar script and capitalization of the fifth letter and the dominance of the "Wind" prefix. Moreover, as the district court held, such a dominant impression receives great weight in determining the likelihood of confusion. *See Kangol v. Kangaroos U.S.A. Inc.*, 974 F.2d 161, 163 (Fed.Cir.1992). Indeed, it would be difficult for TrafFix to adopt a mark that is closer to WindMaster than is WindBuster. This factor favors MDI.

### D. Evidence of actual confusion

TrafFix contends that the lack of evidence of actual confusion precludes summary judgment on likelihood of confusion. Because the two parties had been competing with the similar marks for over two years when summary judgment was briefed, TrafFix also argues for an inference that significant concurrent sales means that no likelihood of confusion has existed. Alternatively, TrafFix suggests that isolated evidence of actual confusion means little given the length of time during which the marks competed. The district court appropriately refused the invitation to draw an inference of no actual confusion from the dearth of evidence, because the marks had not competed against one another for nearly as long as marks in prior cases where such an inference has been drawn. Moreover, because a Lanham Act case only requires proof of potential confusion and not actual confusion, this factor is not as central as TrafFix argues. *See Daddy's Junky Music*, 109 F.3d at 284.

The district court deemed as hearsay and refused to admit into evidence the declarations of MDI employees attesting to telephone conversations in which purchasers called asking about WindBuster signs.[1] The court accepted a declaration from a purchaser stating that he assumed WindBuster was an MDI product, but called the testimony *de minimis* proof. However, even one case of actual confusion can be significant. *See id.* at 284–85. This is true both because it suggests there may be other undiscovered instances of actual confusion, and because it strongly suggests the potential for confusion. The district court found that this factor favors neither party, but we hold that it favors MDI at least slightly.

### E. Marketing channels used

TrafFix does not contest on appeal the district court's finding that the parties use similar trade channels. Hence, this factor clearly favors MDI.

### F. Likely degree of purchaser care

TrafFix agrees with the district court's finding that professional purchasers comprise the buyer class in this case and points to the affidavit of its expert and this court's previous holding that such buyers will have a low propensity to be confused. *See Homeowners*, 931 F.2d at 1111. MDI contends that the "vast majority of buyers are unskilled contractors and buyers who consider price as the primary factor, and whose decisions are typically based on need, convenience and cost." Significantly, the *de minimis* example of actual confusion produced by MDI came from a professional purchaser. He understood there

---

1. MDI argues that the declarations of its employees about actual instances of confusion are not hearsay since they are not being offered to prove the truth of any matter asserted by the callers (*e.g.*, that the callers were already purchasing MDI's products). Moreover, MDI argues that the declarations fall within the state of mind exception that has been recognized by the Second, Fifth, Seventh, and Tenth Circuits, but rejected by the Eighth Circuit and not decided by the Sixth Circuit. *See Fun–Damental Too, Ltd. v. Gemmy Ind. Corp.*, 111 F.3d 993, 1003–04 (2d Cir.1997); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 (5th Cir. 1982); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090–91 (7th Cir.1988); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir.1987). *But see Duluth News–Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir.1996). Like the district court, we find no need to address this evidentiary question since MDI prevails on the trademark issue without the use of this evidence.

were two marks, but he assumed erroneously that WindBuster was another item in the WindMaster line. Purchaser care may be higher than average in this case, but some mistakes are still likely. At most, this factor slightly favors TrafFix.

### G. Defendant's intent in selecting the mark

■ The district court held that seeking an opinion of a trademark attorney and receiving approval of the Trademark Office prior to using the WindBuster mark precludes a finding of improper intent by TrafFix. That Kulp, the owner of TrafFix, sought the advice of counsel and the approval of the PTO does not disprove that he hoped to trade on the goodwill and reputation of the WindMaster brand. It merely indicates that he wanted to do so while staying within the bounds of the law. Intent in selecting the mark is a factor more likely to favor the owner of an infringing mark who was unaware of the prior similar mark. *See Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1449–50 (S.D.Ohio 1990); *See also Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir.1987).

Kulp formerly distributed WindMaster signs, was aware of the favorable reception of WindMaster products in the marketplace, reverse-engineered a WindMaster sign to develop his own product, mimicked the WindMaster sign's appearance, and selected a similar name. It strains credulity to believe WindBuster was associated in Kulp's mind more with the idea of a bucking bronco than with a similar-sounding successful manufacturer of road-sign stands. Still, a finding of willful and intentional trademark infringement seems improper given that TrafFix did delay using its mark until it received PTO approval.

■ If the WindBuster mark was chosen with the intent to cause confusion, that alone may be sufficient to infer confusing similarity. *See Homeowners*, 931 F.2d at 1111, *citing Wynn Oil*, 839 F.2d at 1189. There is at least some record evidence suggesting that TrafFix misled its attorney with regard to some relevant facts in rendering his opinion. Thus, while this factor may not favor either party, TrafFix is not wholly innocent here.

### H. Likelihood of expansion of the product lines

The parties agreed that this factor favored neither of them.

Looking at the eight factors together, only purchaser care favors TrafFix, and that only slightly. This one factor by itself does not create a genuine issue of material fact as to the likelihood of confusion. The district court found more factors favoring TrafFix, which suggests it made every effort to draw inferences in favor of TrafFix. Yet the district court nonetheless concluded that WindMaster and WindBuster are confusingly similar marks as a matter of law. The arguments on appeal provide no reason to disturb that decision.

### IV

■ The Lanham Act's protection of registered trademarks extends also to unregistered trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 2, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *See also Esercizio v. Roberts*, 944 F.2d 1235, 1238 (6th Cir.1991). To recover for trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), MDI must prove by a preponderance of the evidence: 1) that its trade dress has obtained "secondary meaning" in the marketplace; 2) that the trade dress of the two competing products is confusingly similar; and 3) that the appropriated features of the trade dress are primarily nonfunctional. *See Esercizio*, 944 F.2d at 1239; *See also Kwik–Site Corp. v. Clear View Mfg. Co. Inc.*, 758 F.2d 167, 178 (6th Cir. 1985). To defeat summary judgment, MDI must show a genuine issue of material fact as to each of these issues.

### A. Secondary meaning

■ A product's trade dress becomes sufficiently distinctive to qualify for

protection under the Lanham Act if it is either inherently distinctive or if it acquires secondary meaning. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. "To acquire a secondary meaning in the minds of the buying public, an article of merchandise ... must proclaim its identification with its source, and not simply stimulate inquiry about it." *Esercizio*, 944 F.2d at 1239, *quoting West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 595 (6th Cir.1955); *See also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 659 (7th Cir.1995) ("*Thomas & Betts I*") ("Consumers must ... desire the product with the particular feature because it signifies that producer"). To test secondary meaning, the district court applied the seven factors used in the *Sassafras Enterprises* trade dress case:

1. direct consumer testimony;
2. consumer surveys;
3. exclusivity, length, and manner of use;
4. amount and manner of advertising;
5. amount of sales and number of customers;
6. established place in the market; and
7. proof of intentional copying.

*See Sassafras Enters., Inc. v. Roshco, Inc.*, 915 F.Supp. 1, 7 (N.D.Ill.1996). After examining these factors, the lower court concluded that no reasonable trier of fact could determine that MDI had established secondary meaning in the trade dress of its WindMaster signs. However, the inquiry was hampered by the district court's confining the question to whether the dual-spring configuration (rather than the trade dress in its entirety) identifies MDI as the source of the WindMaster sign.

### 1. Direct consumer testimony

MDI offered the deposition testimony of TrafFix employees and a former MDI marketing manager that they could recognize an MDI WindMaster sign stand when driving by on the highway. The district court did not credit this evidence, reasoning that these deponents were not consumers. MDI points to a Seventh Circuit case where nonconsumer testimony was admit-

ted to show secondary meaning where deponents were distributors rather than ultimate consumers. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 294 (7th Cir.1998) ("*Thomas & Betts II*").

### 2. Consumer surveys

No consumer surveys were provided to the court before the motion for summary judgment was filed. The district court refused to weigh unsworn testimony from 40 purchasers attesting to their association of the WindMaster trade dress with MDI that was submitted in untimely fashion and without leave of the court.

### 3. Exclusivity, length, and manner of use

The district court acknowledged the length of time over which MDI has used its trade dress, but discounted that portion (all but five years) that overlapped with its patents. MDI responds that the patents never covered the trade dress, because the two are separate kinds of intellectual property and that MDI, in any event, enjoyed five years of unique trade dress after the patents expired and before TrafFix began using a similar trade dress.

MDI also licensed its dual-spring configuration to Eastern Metal company around 1986. The district court found that this undercut identification of that product feature with one source. *See Sassafras*, 915 F.Supp. at 8, *citing* 1 J. Thomas McCarthy on Trademarks and Unfair Competition § 8.02[5], (3d ed.1995). MDI asserts that Eastern Metal paid in part for the use of the trade dress, which should support that it has a secondary meaning worth acquiring.

### 4. Amount and manner of advertising

The district court found that the amount of advertising, while substantial, did not establish much without showing that a link was established in the mind of consumers. Moreover, the court found that MDI's advertising emphasized no particular aspect

of WindMaster's look, merely pictured the product, and did not identify anything as trade dress.

MDI responds that its promotional literature, mailers, and trade show miniature stands all illustrate the look of the sign stand, and that other courts have found such advertising persuasive. *See Sara Lee Corp. v. American Leather Prods., Inc.*, No. 97 C 4158, 1998 WL 433764, at *13 (N.D.Ill. July 29, 1998) ("COACH's print advertisements highlight the trade dress to the consumer by featuring the products in isolation"); *See also Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572 (Fed. Cir.1988) (finding secondary meaning for shape of guitar head always appearing in advertising and promotional literature).

### 5. Amount of sales and number of customers

The district court discounted this factor since sales success could be attributed to a number of factors other than trade dress. It also noted that MDI's figure of more than $1 million in annual sales for over 20 years was not compared to any competitor's numbers to provide context. MDI argues that the only evidence in the record to account for WindMaster's sales success is the goodwill built up in its trademark and trade dress.

### 6. Established place in the market

No market-share information is in the record.

### 7. Proof of intentional copying

The district court found that although TrafFix intentionally copied MDI's design, it did not necessarily do so to confuse customers. In so finding it relied on deposition testimony provided by TrafFix claiming that MDI's design was copied because it was believed to be in the public domain after the WindMaster patents expired.

MDI responds that intentional copying merits a stronger inference of trying to take advantage of an existing secondary meaning than the lower court allows; how-

ever, the cases cited by MDI do not involve a utility patent that could provide an ulterior motive here. *See Esercizio*, 944 F.2d at 1239; *See also DAP Products, Inc. v. Color Tile Mfg., Inc.*, 821 F.Supp. 488, 492 (S.D.Ohio 1993). There is nothing to copy from a design-patented article other than its look, but if form follows function, a similar look might naturally result from copying the protected mechanism in a utility patent. The inference MDI urges does not conclusively show that TrafFix sought to take advantage of an extant secondary meaning.

Nevertheless, drawing all reasonable inferences in favor of the nonmoving party, we must conclude that MDI has shown that a genuine issue of material fact exists as to secondary meaning for its sign stand's trade dress. Considering the sign stand as a whole, and not just the dual-spring configuration, a reasonable juror could conclude that the WindMaster sign stand had obtained secondary meaning in the marketplace that TrafFix sought to misappropriate.

### B. Confusing similarity

After conducting a *Frisch's* factor analysis, as is proper for trade dress as well as trademark confusion cases, the district court was unwilling to hold as a matter of law that the two trade dresses are not confusingly similar. Since the district court thus based its grant of summary judgment for TrafFix on the other two requirements, there is no need to consider the *Frisch's* factor analysis in detail here.

### C. Primarily nonfunctional

Finally, MDI must show that the trade dress features appropriated from WindMaster were primarily nonfunctional. This requirement ensures that trade dress protection will not be used effectively to extend a patent: "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a pro-

ducer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). The Sixth Circuit deems a product feature to be legally functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Esercizio*, 944 F.2d at 1246, *quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

■ The district court's conclusion that WindMaster's purported trade dress was instead an unprotectable functional element rested on three main findings. First, it found that the utility patent disclosed the dual-spring design as functional, so that WindMaster is estopped from arguing that it is nonfunctional in the trade dress context. Second, the district court found that the dual-spring design had been promoted as functional, rather than as aesthetic or a merely identifying feature. Finally, the lower court found that recognizing WindMaster's trade dress claim would put competitors at a disadvantage by affecting the cost and quality of the alternative designs remaining for their use.

In determining that a prior utility patent creates a presumption against a trade dress claim, the district court relied heavily on the McCarthy treatise: "[O]ne cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection." 1 J. Thomas McCarthy on Trademarks and Unfair Competition § 7:89 (4th ed.1996). In his patent application Sarkisian, MDI's president, claimed that "two spaced apart spring connections ... prevent twisting of the sign frame." In subsequent successful litigation over the patent, Sarkisian contended that closely-spaced dual-coil springs were functionally equivalent and covered by the patent. MDI contends that litigation over the patent concerned the utility of the dual-spring design, while litigation over trade dress concerns the appearance of the dual-spring design.

A circuit split exists as to whether a utility patent disclosure forecloses trade dress protection. The Fifth, Seventh, and Federal Circuits have held or strongly suggested that a utility patent disclosure does not prevent trade dress protection. *See Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 256 (5th Cir.1997) ("[T]he fact that the American Classic Mixmaster® incorporates functional features named in utility patents does not compel the conclusion that the product configuration is legally functional"); *Thomas & Betts II*, 138 F.3d at 288 (reversing the district court's misstatement of the law and holding that "there is no per se prohibition against features disclosed in a patent receiving trademark protection after the patent has expired"); *Midwest Indus., Inc., v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1362 (Fed.Cir.1999) ("[S]tatements in a patent may provide evidence that the asserted trade dress is functional, and thus not entitled to legal protection. But the fact that a patent has been acquired does not convert what otherwise would have been protected trade dress into nonprotected matter" (citations omitted)). Only the Tenth Circuit, in an opinion that preceded the contrary rulings of the other three circuits, has held that "[w]here a product configuration is a significant inventive component of an invention covered by a utility patent ... it cannot receive trade dress protection under section 43(a)." *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1500 (10th Cir.1995).

■ The Tenth Circuit argued that a per se rule is necessary to effect the public policy underlying patent law of releasing protected designs after a period of time. But those functional designs may be separated from the appearance here. So long as it is possible to protect the appearance without protecting the design, a per se rule is not necessary. Here that might be possible, as MDI suggests, by not extending trade dress protection "to vertically arranged coil springs with other leg mem-

bers (U-shaped, parallel, etc.) and/or with other uprights (twin poles, A-shaped, etc.) [that] may create an entirely different look altogether." It takes little imagination to conceive of a hidden dual-spring mechanism or a tri or quad-spring mechanism that might also avoid infringing WindMaster's trade dress. The best way to decide the feasibility of such alternatives is to do a functional analysis of the trade dress unencumbered by any presumptions other than the ordinary burden of proof assumed by the plaintiff.

The district court next found functionality based on WindMaster's promotion of the dual-spring design's performance rather than its appearance. MDI argues that it has not specifically promoted the appearance of the dual springs because its trade dress is not confined to that element. Rather, the entire look of its WindMaster display sign stand has been promoted through pictures in catalogs and a miniature stand used at trade shows. MDI is correct to contend that the lower court committed legal error by evaluating an individual component of the trade dress rather than its entirety. *See Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 71–72 (2d Cir.1994); *The Antioch Co. v. Western Trimming Corp.*, Nos. 98–3876, 98–3943, 1999 WL 777556, at *3 (6th Cir.1999), *quoting Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir.1988). The district court focused solely on the dual-spring design because it says that every other competitor uses the other elements of a single upright, four leg members extending out at angles, and a sign. This analysis fails to note that all of the other competitors lack the dual-spring design; they avoid emulating the trade dress in that manner. If TrafFix or another competitor chooses to use the dual-spring design, then it will have to find *some other way* to set its sign apart to avoid infringing the WindMaster's trade dress. It is the combination of all the elements that, as MDI correctly argues, could confuse the public.

■ Finally, the district court found that protecting the trade dress asserted by MDI would put its competitors at a disadvantage beyond the merely reputational. Because the dual-spring design is one of a limited number of superior designs, the lower court found that the design element is a functional one. Presumably every limitation on what another competitor can do hinders competition somewhat. The appropriate question is whether the particular product configuration is a competitive necessity. If it affects the cost or the quality or the objective (nonreputational) desirability of competitors' products negatively enough, then the trade dress element may be deemed legally functional. Having any effect on cost or quality is not enough. Exclusive use of a feature must "put competitors at a *significant* non-reputation-related disadvantage" before trade dress protection is denied on functionality grounds. *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300 (emphasis added).

■ MDI points to its numerous competitors and their equivalent products as proof that MDI's trade dress is not a competitive necessity. The district court stated that those competitors' designs are themselves patented and therefore unavailable to TrafFix. That is beside the point. TrafFix does not get to copy the trade dress of its competitor whose patent has expired just because other design options are still under patent. TrafFix could come up with its own design, or license one of the outstanding patents, or use the dual-spring design in a way that does not infringe MDI's trade dress. As with intellectual property and competition law generally, the proper question is the overall effect on competition if a particular trade dress claim receives protection, not the prospects of any particular competitor when that protection is granted. *Cf. Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (noting the policy of the Sherman Act to protect the public's interest in com-

petition, not private concerns of competitors).

The same facts can support both trademark (and/or trade dress) infringement and unfair competition under § 43(a) of the Lanham Act. *See Frisch's Restaurants*, 849 F.2d at 1015. The unfair competition claim thus must be remanded for further proceedings along with the trade dress claim.

## V

The parties agree and the district court noted that "before reaching the merits of an antitrust claim, it is necessary to identify the relevant markets." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir.1986). This prioritization, however, addresses market definition a bit prematurely, at least in the context of a claim of sham litigation. The purpose of market definition is to determine whether the antitrust defendant actually exerts or threatens to exert monopoly control over any particular market segment. Under § 2, a defendant obviously cannot be illegally protecting a monopoly if it does not enjoy a monopoly in the first place. By the same token, however, if the activity of which the purported monopolist is accused would not be illegal even for a monopolist, then identifying a monopolized market is superfluous. Thus, while it is certainly necessary to identify a relevant market in order to prove a § 2 violation, it is not necessary to identify a relevant market in order to disprove a § 2 violation—which was MDI's goal in seeking summary judgment. As the *Potters* precedent itself demonstrates, it is possible to affirm summary judgment on claims of sham proceedings without first defining a relevant market. *See id.* at 574–75.

For this reason, it is possible to dispense with the market definition question until after deciding whether asserting trade dress rights after the expiration of a patent in the circumstances of this case can violate § 2. To prove that trademark or trade dress infringement litigation violates § 2, it must first be shown that the suit was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Then TrafFix must show that MDI filed a baseless suit as "an attempt to interfere *directly*" with TrafFix's business relationships through the use of the process of litigation rather than the outcome sought. *Id.* at 60–61, 113 S.Ct. 1920, *citing Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In other words, to prevail on its antitrust claim, TrafFix must show that MDI brought its trade dress claim knowing it had no chance for success and with the intent of deterring competition.

As the district court noted, courts do allow parties to pursue trade dress rights in the face of an expired patent. *See Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 638 (7th Cir.1993). TrafFix argues that trade dress rights may be pursued after design patents expire, but not after utility patents expire. TrafFix points to no authority for this proposition, and there does not appear to be a per se rule to this effect, as discussed, *supra* at 939–40 (noting the weight of authority from other circuits against any such per se rule). Thus, TrafFix cannot argue that MDI had a baseless suit merely because its patent had expired.

Nor does TrafFix provide any reason to believe that a utility patent and trade dress protection must be mutually exclusive. The consensus on this question is that patent and trademark law protect different interests, and that "a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property." *Kohler*, 12 F.3d at 638–39 (collecting sources). If protectable at all, the trade dress of MDI's WindMaster signs is protectable separately from its patents. Moreover, as seen from the earli-

**942**

er discussion, MDI's claim of trademark and trade dress infringement is not so outlandish as to appear to be brought only to burden a competitor with litigation. This is especially true given the heretofore unsettled character of trade dress protection for product configurations in this circuit. Nor has TrafFix provided an ounce of evidence suggesting an improper motive on MDI's part. For these reasons, the district court properly held that MDI's trade dress claim was not an unlawful attempt to monopolize in violation of § 2.

Since the activity that MDI has undertaken has not been deemed anticompetitive, there is no reason to have allowed discovery on the market definition issue. The district court did not abuse its discretion in granting summary judgment before allowing discovery.

## VI

Summary judgment was appropriate on the trademark infringement claim since TrafFix established no genuine issue of material fact. However, because TrafFix received PTO approval for its mark, it cannot be said to have willfully and intentionally infringed MDI's mark. The district court judgment on this issue is affirmed, and the claim remanded to determine damages for the infringement. Despite the cross-motions for summary judgment on the trade dress and unfair competition claims, it should not have been granted to either party. MDI established a genuine issue of material fact as to secondary meaning, and the district court ruling was legally erroneous on the functionality question. Therefore, a grant of summary judgment to TrafFix was unwarranted. Since the actions pursued by MDI were thus clearly reasonable under the law, no antitrust violation attaches, and it was not an abuse of discretion not to allow discovery on the issue of MDI's market power. Accordingly, we AFFIRM the judgment of the district court in part, REVERSE in part, and REMAND the case for further proceedings consistent with this opinion.