challenges on appeal, alleging that the district court erred in its legal analysis.  We express no opinion as to that holding or the court's analysis of that element of the claim because we need not reach that issue.

AFFIRMED.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0236P (6th Cir.)
File Name:  02a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WILLIE W. GRAY; GREGORY
C. GRAY; GLENDA C. GRAY;
WILMER J. GRAY; ANOTHER
IMAGE MANAGEMENT, INC.,
d/b/a "THE POPCORN
SHOPPE"; TPS PACKAGING,
INC., a/k/a "TPS POPCORN
CO., INC.,"

No. 00-1905

  *Plaintiffs-Appellants,*


  *v.*


MEIJER, INC.,

  *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00138—Richard A. Enslen, District Judge.

Argued:  October 30, 2001

Decided and Filed:  July 16, 2002

Before: SILER and COLE, Circuit Judges; STAFFORD, District Judge.[*]

---

**COUNSEL**

---

**ARGUED:** Howard K. Jeruchimowitz, ALTHEIMER & GRAY, Chicago, Illinois, for Appellants. Mark H. Verwys, PLUNKETT & COONEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Howard K. Jeruchimowitz, William B. Hoff, Jr., ALTHEIMER & GRAY, Chicago, Illinois, for Appellants. Mark H. Verwys, PLUNKETT & COONEY, Grand Rapids, Michigan, for Appellee.

---

**OPINION**

---

SILER, Circuit Judge. Plaintiffs Willie W. Gray, Gregory C. Gray, Glenda C. Gray, Wilmer J. Gray, Another Image Management, Inc., doing business as "The Popcorn Shoppe," and TPS Packaging, Inc., also known as TPS Popcorn Co., Inc., (collectively, "Gray") appeal the district court's grant of summary judgment to Defendant Meijer, Inc. ("Meijer") on their claim of trade dress infringement under the Lanham Act. We affirm.

#### FACTUAL AND PROCEDURAL BACKGROUND

In May 1993, the Gray family opened "The Popcorn Shoppe" (the "Shoppe") in Kentwood, Michigan, adjacent to a beauty salon owned by a member of the Gray family. Initially, the Shoppe sold three different types of popcorn – butter, caramel and cheese – to the salon customers. The Shoppe soon expanded to selling popcorn at other beauty

[*] The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

then intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation." *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 246-47 (2d Cir. 1983) (citations omitted); *accord Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859 n.13 (11th Cir. 1983) ("Proof of intentional copying is evidence, but not conclusive, on the likelihood of confusion issue."). We agree. Gray cannot rely on its allegations of copying where the mark was not strong and the alleged copy is not very similar to Gray's trade dress. There was no "brand equity" to capitalize on either as a result of the unique packaging of Gray or an investment of advertising effort into that packaging. Even if Meijer copied the idea of including the term "Chicago Style" and a depiction of the Chicago skyline, those elements, as used by Gray, are non-unique packaging elements not worthy of intellectual property protection unless infused with some secondary meaning, absent here. Therefore, the court did not err in its conclusion that Meijer's intent in selecting the trade dress favors neither party.

#### 7. Evaluation of the factors

In evaluating the factors, Gray has only raised an issue as to the "relatedness of the goods." Though the district court had found that "marketing channels used" favored Gray, for the reasons discussed, we find that Gray has not raised a question as to this factor. Accordingly, the district court's finding that Gray has not raised a material issue of fact as to likelihood of confusion was not erroneous.

#### CONCLUSION

As the district court's finding that Gray has not raised a material issue of fact as to the likelihood of confusion was not erroneous, and, accordingly, as likelihood of confusion constitutes one of the three required elements to state a claim for trade dress infringement, the district court did not err in granting summary judgment to Meijer.

The district court found material questions of fact as to the inherent distinctiveness of Gray's packaging, which Meijer

Meijer redesign and Meijer's new package. The district court noted that this court has held that "if a defendant's intent in adopting a mark was to derive benefit from the reputation of the infringed upon mark, this factor alone could justify an inference that there is a confusing similarity." (citing *Wynn Oil*, 839 F.2d at 1188-1189). But the district court concluded that no such inference can be made because Gray's product was not in the marketplace at the time Meijer allegedly copied it and that this inference is only relevant when the products' trade dress is similar. On appeal, Gray focuses on its allegation of intentional copying, arguing that the slightest evidence of copying should create a genuine issue of material fact. This argument, however, underscores the fundamental misconception under which Gray's case suffers, the notion that no copying or borrowing of ideas should be allowed.

A respected treatise, McCarthy on Trademarks and Unfair Competition, addresses the misguided notion that copying is illegal:

> The first principle of unfair competition law is that everything that is not protected by an intellectual property right is free to copy. In fact, copying is an essential part of the whole fabric of an economic system of free competition. Thus, the act of "copying," far from being intrinsically improper, is essential and should be lauded and encouraged, not condemned. There is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain.

McCarthy on Trademarks and Unfair Competition § 23:122 (2001) (citations omitted). Other circuits that have likewise found that a presumption of intent to confuse arises when evidence of copying is presented recognize that if there is no real issue of a likelihood of confusion, evidence of copying is of no import. *Id.* (citations omitted). "We have recognized that evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded. But if comparison of the works reveals no fair jury issue concerning likelihood of confusion,

salons. The original packaging was cellophane with a small, yellow label that described its contents. In January 1994, Gray decided to pursue wholesale sales of its product. As part of this effort, a customer who was a graphic designer agreed to design a new package for Gray's "Chicago Style" mix of their three types of popcorn. According to Gray, the main elements of its packaging were (1) the brand name "The Popcorn Shoppe" on the top of the bag; (2) a description of the contents "Chicago Style Mix"[1] also on the upper portion of the bag; (3) a depiction of the Chicago skyline in the middle of the bag; and (4) red and yellow colors on the top and bottom of the bag.

With the new package, Gray approached Meijer, a Midwest retailer that operates 130 stores in Michigan, Illinois, Indiana, Ohio and Kentucky. Gray's representatives met with Meijer's salty snack buyer and his planned successor to that position on March 31, 1994. The Meijer representatives tasted Gray's product and examined its packaging. The Meijer representatives agreed to make shelf space available in all its stores once Gray had obtained a nutritional label, as required by law, and selected a distributor capable of handling large volume orders. Gray's representatives agreed to keep Meijer updated on their progress. The remaining package and product were left behind.

Meijer had begun developing its own private-label Chicago Style popcorn in 1992, and began selling the product in its Michigan stores by March 1994. Meijer's original popcorn package had a yellow-checkered background with red and blue lettering, no trim, no depiction of the Chicago skyline, and included the description "Chicago Style." Three months after Meijer's meeting with Gray, Meijer commissioned a redesign of its entire private label salty snack food line. Meijer hired a freelance graphic designer. The redesign included Meijer's Chicago Style popcorn package. She

---

[1]"Chicago Style" refers to a mixture of caramel, butter and cheese popcorn and is a common label in the industry, deriving from the Chicago street vendors that originated the mix in the mid-1980's.

completed her redesign that summer and the changes were incorporated into the bag beginning in late 1994. She attests that she did not refer to or even know of the Gray-designed bag.

Meanwhile, Gray hired a laboratory to conduct the requisite nutritional analysis and incorporated this analysis into its package. Gray also made arrangements with a new distributor and manufacturer. Finally, two years later in March 1996, Gray returned to Meijer. Meijer ordered 275 cases of Gray's popcorn. Gray complains that Meijer did not inform Gray when its product would be in its stores, and Gray did not find out until it received an inquiry from a customer. Thus, Gray was not able to arrange point-of-sale promotions or other support for its product.

In its salty snack food aisle, Meijer shelves products by source, not type. Meijer groups all of its private-label snack foods together, including its Chicago Style popcorn. Gray's product was shelved on aisle "endcaps" or in center aisle displays, the premium spots designed to feature new products, pursuant to standard Meijer practice. In April 1996, Meijer decided to discontinue carrying Gray's popcorn due to poor sales. Both the individual and corporate plaintiffs filed for bankruptcy in 1996, with the corporate plaintiffs permanently ceasing all operations.

Besides Meijer, Gray's sales efforts involved several other retailers. From April 1994 to May 1995, Gray sold 150 cases of popcorn to the supermarket D & W, with an estimated gross profit of $900. From April 1994 to April 1995, it sold 1,000 cases to Spartan Stores, with an estimated gross profit of $600. The record does not indicate that Gray made further wholesale sales, aside from Meijer, after the fall of 1995.

As for its marketing efforts, Gray performed point-of-sale promotions in D & W Supermarkets in April 1994. Also, Gray ran some limited newspaper advertisements.

Gray sued Meijer in 1999. Meijer moved for summary judgment as to all claims. On the claim for trade dress

*v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 672 (Fed. Cir. 1984) (holding that purchasers of relatively inexpensive products should be held to a lesser standard of purchasing care); *cf. Homeowners Group*, 931 F.2d at 1111 (holding that expensive items marketed to sophisticated buyers resulted in a lesser likelihood of confusion). Logically, in assessing the likely degree of purchaser care, courts have found that the relative locations of the competing products on store shelves are significant. *See, e.g., McNeil-PPC, Inc. v. Guardian Drug Co., Inc.*, 984 F. Supp. 1066, 1072 (E.D. Mich. 1997). In *McNeil-PPC*, the district court held "[p]laintiff's and Defendant's products appear side-by-side on the store shelf. Defendant, as the store owner, no doubt is responsible for the decision to locate the products side-by-side on the shelf. The close proximity of the products on the store shelf balances this factor in favor of Plaintiff." *Id.* This case presents the converse of that situation. As Gray contends, Meijer controlled the placement of the products, and it chose to put Gray's product with other independent brands and its own product with other Meijer products. Though popcorn was in the same basic area, we agree with the district court in the importance of the placement of the products, as it can naturally be inferred that if Meijer had sought to confuse and trade-off Gray's popcorn brand, then it would have placed them side-by-side rather than surround its popcorn with other Meijer products, which clearly indicates that all products in that section are Meijer products. As the district court concluded, "[a] purchaser with even a minimal degree of care and sophistication would not reasonably believe that the Grays' popcorn product was placed alone amidst a sea of Meijer's private label products. The placement of the products minimizes the likelihood of confusion between the products. This factor favors Meijer." Such conclusion was not erroneous.

### 6.    Defendant's intent in selecting the mark

Though Gray raises this issue with regard to other of these *Frisch* factors, its principal argument in this case is that Meijer copied its bag, which it infers from the timing of the

stores in the same general area from March to April 1996 but not side-by-side.  This court has affirmed a district court's conclusion that "because there is no evidence that the product is presently being sold in the same stores . . . the weight [] given this factor is very slight."  *K'Arsan Corp. v. Christian Dior Perfumes, Inc.*, No. 97-1867, 1998 WL 777987, at *7 (6th Cir. Oct. 21, 1998) (unpublished disposition) (*per curiam*).  A similar finding is appropriate here.  Given that there is no evidence in the record of overlapping marketing approaches, the products were only sold in the same store for at most a month, and there is no danger such products would ever be sold in the same store again, this factor should be considered to weigh in favor of Meijer or be considered neutral.  In either event, this factor has not been shown by Gray to be in dispute, despite the district court's contrary finding below.

### 5.    Likely degree of purchaser care and sophistication

The district court found that retail consumers of popcorn would not be exercising a high degree of care or sophistication.  But the district court found that the relative locations of the products in the Meijer stores were particularly significant because Meijer grouped products by mark.  All of Meijer's store brands were presented separately from the independent brands.  Therefore, the court found that this factor favored Meijer.  On appeal, Gray argues that for products in which consumers exercise less care there is a greater likelihood of confusion.  It also argues that though the products were not placed side-by-side, they were in close proximity, and Meijer controlled the products' placement.  Therefore, Gray argues it should not be disadvantaged in its case as a result of the placement of its products.  Finally, Gray argues that this factor is less significant and dependent on similarity.

Courts have adopted the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products, such as snack food.  *See, e.g., Specialty Brands, Inc.*

infringement, the court found that there were genuine issues of material fact on the issue of whether Gray's product was inherently distinctive, but the court found that there were no genuine issues of material fact as to the likelihood of consumer confusion between Gray's product and Meijer's product, granting summary judgment to Meijer.  This finding disposed of the trade dress infringement claim under the Lanham Act, as well as the common law unfair competition claim and the  Michigan Consumer Protection Act (MCPA) claim.  The district court declined to exercise supplemental jurisdiction over the breach of contract claim, dismissing it without prejudice.  Gray does not appeal the court's holdings as to its other claims though each is of course dependent upon the Lanham Act issue before us.

### DISCUSSION[2]

The Lanham Act's protection of registered trademarks also extends to unregistered trade dress.  *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 200 F.3d 929, 936 (6th Cir. 1999) (citation omitted), *overruled in part on other grounds*, 532 U.S. 23 (2001).  To recover for trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must prove by a preponderance of the evidence: (1) that its trade dress has obtained "secondary meaning" in the marketplace; (2) that the trade dress of the two competing products is confusingly similar; and (3) that the appropriated features of the trade dress are primarily nonfunctional.  *Id.*  To defeat summary judgment, Gray must show a genuine issue of material fact as to each of these issues.

As the dispositive element of the district court's analysis, we take up "likelihood of confusion" first.

---

[2]This court reviews *de novo* the district court's grant of summary judgment without a trial on the issue of trade dress infringement. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

## A.  "Likelihood of Confusion"

To prevail on its trade dress claim under the Lanham Act, Gray must prove that the purportedly infringing mark is "likely to cause confusion" in prospective purchasers' minds. 15 U.S.C. § 1114; *Marketing Displays,* 200 F.3d at 933 (addressing trademark infringement).  Likelihood of confusion can be a question of law appropriate for determination on a motion for summary judgment. *Marketing Displays*, 200 F.3d at 933 (citing *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983)).  We have identified eight factors relevant to the likelihood of confusion inquiry, commonly known as the *Frisch* factors:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982).  None of these factors is dispositive of a plaintiff's case; "[t]hese factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks.  They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).  "The general concept underlying likelihood of confusion is that the public believe that the mark's owner sponsored or otherwise approved of the use of the trademark." *Id.* (citations omitted).  Summary judgment for the defendant is appropriate if, upon consideration of all factors, the district court determines that no reasonable jury could fail to find that confusion of the marks would be likely.  "It would be illogical for a merely disputed factor to preclude summary judgment . . . the nonmoving party's burden is to

semantic difference has no practical effect as "[t]he nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Marketing Displays*, 200 F.3d at 934.  Whether the court says that this factor favors Meijer or neither party is of no import in that Gray bears the burden to identify disputed factors. This factor does not satisfy that burden.

### 4.    Marketing channels used

The district court found that "[t]o the extent that the Grays attempted to sell their product in Meijer stores, the parties had similar marketing channels.  This factor favors the Grays." Meijer argues that it only sells its brand in its stores and that Gray's product would not be sold in its stores after the initial failure of that effort.  Thus, this factor should favor Meijer or be neutral.  Gray responds that when it was in business, both parties targeted retail consumers of popcorn.

The marketing channels factor requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services. *Daddy's Junky Music Stores*, 109 F.3d at 285 (citing *Homeowners Group*, 931 F.2d at 1110).  A court must determine whether the marketing approaches employed by each party resemble each other. *Id.*; *see, e.g., Wynn Oil*, 839 F.2d at 1188 (finding national marketing effort of one party inevitably overlapped opponent's local advertising campaign to some degree, although overlap probably would not increase likelihood of confusion significantly); *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (finding sophisticated and televised advertising campaign by national fast-food chain was "quite different" from far less sophisticated advertising by small, local fast-food business).

In this case, it is clear from the facts that the marketing efforts of Gray and Meijer did not overlap.  There does not appear to be any evidence in the record that Meijer marketed its store brand popcorn or that Gray engaged in any significant marketing efforts at all.  The products were sold in the Meijer

found the two packages dissimilar. We agree. The packages have some coloring and the inclusion of "Chicago Style" and a silhouette of the Chicago skyline in common, but the skylines are in different places on the package (middle vs. bottom); the skyline silhouettes look very different; Meijer has a big popcorn kernel on the front; the brand Meijer is labeled prominently on the top of the package as is Gray's "The Popcorn Shoppe" label; and though using similar colors, the design layout of the bags are sharply different. Gray criticizes the district court's analysis, arguing that the "side-by-side" test is not the appropriate test. Rather, Gray argues that this Court's precedents provide that the appropriate test is "whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them . . . ." *Daddy's Junky Music Stores*, 109 F.3d at 283.

It is unfortunate that the district court used the terminology "side-by-side comparison," but, nevertheless, the court then carefully proceeded to compare and contrast the bags, finding significant differences, as noted *supra*. Importantly, as the district court also noted, the fact that the Meijer bag "prominently displays the 'Meijer' mark and that its design is consistent with its other private label brands would lead a consumer to believe that the product is a private label snack, not a product manufactured by the Grays." The differences noted by the district court were not the technical differences implied by a "side-by-side comparison." Rather, the differences in the two packages and the general impression each creates are not similar. The district court's finding that the Gray trade dress was not very similar to the Meijer trade dress is not erroneous.

### 3.    Evidence of actual confusion;

The district court found that Gray admitted that there was no evidence of actual confusion. Thus, the court found that this factor favors Meijer. Gray argues on appeal that the absence of evidence favors neither party. However, such

identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Marketing Displays*, 200 F.3d at 934. A finding that at least one factor favors the nonmoving party is likely, but such finding does not prevent an overall finding of no likelihood of confusion or preclude summary judgment. *Id.*

The district court weighed the eight factors and found that four factors favored Meijer, that Gray had not raised a material issue of fact as to those factors, including "strength of the plaintiff's mark"; "similarity of the marks"; "evidence of actual confusion"; and "likely degree of purchaser care." The court found that two factors favored Gray: "relatedness of the goods" and "marketing channels used." Finally, the court found that two factors favored neither party or were irrelevant: "defendant's intent in selecting the mark" and "likelihood of expansion of the product lines." On appeal, neither Gray nor Meijer contests that the "relatedness of the goods" is present, *i.e.*, both products are a Chicago Style popcorn, and that "likelihood of expansion of the product lines" is not a relevant factor. Leading the district court's inquiry was the fact that it found no genuine issue of fact as to the two most important *Frisch* factors, strength of the mark and similarity of the trade dress.

### 1.    Strength of the plaintiff's mark

The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace. A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both. The stronger the mark, all else equal, the greater the likelihood of confusion.

*Homeowners Group, Inc. v. Home Marketing Specialists*, 931 F.2d 1100, 1107 (6th Cir. 1991) (citations and quotations omitted). The district court held that "[w]hile a reasonable

jury could conclude that any package is inherently distinctive, to gauge the strength of that trade dress, it is useful to look to the extent to which that packaging has acquired secondary meaning." (citing *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846, 851 (E.D. Mich. 1997)). The district court then proceeded to consider the factors articulated by this court to aid in determining whether a trade good has acquired "secondary meaning." *See Marketing Displays*, 200 F.3d at 937 (setting forth the seven factor test for determining acquisition of secondary meaning). Gray argues principally that the court inappropriately focused on the acquisition of secondary meaning as opposed to the inherent distinctiveness of the product, emphasizing that the court had already found material questions of fact existed as to the "inherent distinctiveness" element of the test for trade dress infringement. Gray also refers to point of sales reports in the record as evidence of a strong trade dress not considered by the court below.

Strength of a plaintiff's trade dress depends upon the interplay of two elements, the uniqueness of the trade dress and the investment in imbuing a trade dress with secondary meaning. Thus, the most mundane packaging may be infused with meaning by advertising and other promotional tools, rendering a strong trade dress. Likewise, particularly unique packaging even without any artificial efforts to establish a secondary meaning for the product may result in a strong trade dress. The combination of these two factors determines the relative strength or weakness of the trade dress.

In this case, as the district court found, it is clear that Gray's packaging had not received any significant advertising or promotional efforts to create a secondary meaning for the packaging, and the product enjoyed no real success in the market. The facts speak for themselves. The sales of popcorn products from April 1994 till Gray went out of business in 1996 totaled less than 1200 cases. Gray invested almost nothing in building the brand equity of the product, and the actual brand equity was reflected in the low sales of the product. The vague results of the extremely limited point of

sales reports referred to by Gray in its brief add nothing to this analysis. However, it is true, as Gray points out, that a unique product may still be considered to have a strong trade dress despite the lack of investment in the branding or notoriety of the product. This is right and fair in that start-up companies, such as Gray, would not be afforded trade dress protection without such an exception. The problem for Gray is that its packaging is not unique.

Gray confuses the first element of the trade dress analysis, inherent distinctiveness, with this aspect of the likelihood of confusion analysis. As the district court noted, any packaging may be said to have inherent distinctiveness by virtue of the breadth of colors, shapes, graphics, *etc.*, available to the packager in designing its trade dress. In determining the strength of such trade dress, however, the analysis is different as the inquiry revolves around the "uniqueness" of the packaging. To be considered a strong mark without any significant branding of the product through artificial means, the product must be "naturally" branded. The district court aptly addressed Gray's product, finding:

> [N]either the elements of the packaging, nor the product itself were exclusive or unique. The term "Chicago Style" has been widely used for many years for a variety of products. It has been used to describe popcorn combination mixtures and, in fact, Meijer sold its private label triple mix product in its Michigan stores before the Grays did. The same is true of the Chicago skyline. The Grays have no proprietary rights to the Chicago skyline which is depicted on the packaging of many products.

Accordingly, absent any uniqueness of the packaging or any significant branding investment in the packaging, the district court's finding that the Gray trade dress was weak is not erroneous.

### 2.    Similarity of the marks

This point is best articulated by actually comparing the Gray packaging with the Meijer packaging. The district court