**BIG TIME WORLDWIDE CONCERT & SPORT CLUB AT TOWN CENTER, LLC, Plaintiff,**

v.

**MARRIOTT INTERNATIONAL, INC., Defendant.**

**No. CIV.02–40289.**

United States District Court, E.D. Michigan, Southern Division.

Jan. 2, 2003.

---

1. Plaintiff has withdrawn his claim under the Family Education Rights and Privacy Act.

Lawrence R. Jordan, Joan H. Lowenstein, Peter M. Falkenstein, Jaffe, Raitt, Ann Arbor, MI, for BIG Time Worldwide Concert and Sports Club at Town Center, L.L.C., plaintiff.

K. Scott Hamilton, Dickinson Wright, Detroit, Michael A. Grow, Leo M. Loughlin, Washington, DC, for Marriott International, Incorporated, defendant.

## ORDER DENYING PRELIMINARY INJUNCTION

GADOLA, District Judge.

Before the Court is Plaintiff's Motion for a Preliminary Injunction. *See* Fed. R.Civ.P. 65(a); E.D. Mich. LR 65.1. Plaintiff, who does business as BIG TIME WORLDWIDE, seeks to enjoin Defendant from using the federally registered mark BIG TIME TICKETS. For the reasons stated below, the Court shall deny the Motion.

### I. HEARING

■ Although "Rule 65 [of the Federal Rules of Civil Procedure] requires a hearing before a preliminary injunction may issue," *Sec. & Exch. Comm'n v. G. Weeks Securities Inc.*, 678 F.2d 649 (6th Cir. 1982), *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local 70*, 415 U.S. 423, 433, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974), "preliminary injunctions [may be] denied without a hearing, despite a request therefor by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be manifestly pointless." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2949 (1995); *see also Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175–76 (3d Cir.1990) ("[Rule 65(a) ] does not make a hearing a prerequisite for ruling on a preliminary injunction. Obviously, a hearing would not be necessary if the movant is proceeding on a legal theory which cannot be sustained, because then there could be no showing of a likelihood of success on the merits."); *Commerce Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 341 (5th Cir.1984); *Jack v. Baker*, No. 1:01–CV–04, 2001 U.S. Dist. LEXIS 12326, at *2–3 (W.D.Mich. Aug. 6, 2001) ("there are instances in which hearing of an in-

junction motion is unnecessary. Examples include ... where the legal theory underlying the request is clearly untenable." (citing *Bradley,* 910 F.2d 1172)); *Dennie v. Abramson Enters.,* 124 F.Supp.2d 928, 931 (D.Vi.2000) ("the court was not required to hold a hearing before denying [the preliminary injunction]."); *LaRouche v. Webster,* 566 F.Supp. 415, 419 (S.D.N.Y.1983) ("There is no doubt that a preliminary injunction may be denied without a hearing." (internal quotation omitted)).

"This practice is supported by Rule 78 [of the Federal Rules of Civil Procedure], which provides that 'the court may make provision by rule or order for the submission and determination of motions without oral hearing ...,' and by the fact that Rule 65 does not explicitly require an oral hearing on a preliminary injunction motion." Wright, *Federal Practice,* § 2949. *See also* E.D. Mich. LR 7.1(e)(2) ("Oral hearings on ... motions will be held unless the judge at any time prior to the hearing orders their submission and determination without oral hearing on the briefs filed as required by this rule.").

In this case, the written submissions to the Court so clearly demonstrate that Plaintiff is not entitled to a preliminary injunction that conducting a hearing would be manifestly pointless. Thus, the Court shall proceed without a hearing on the Motion. *See* E.D. Mich. LR 7.1(e)(2).

## II. BACKGROUND

Plaintiff is a self-styled ticket "broker" that sells tickets to sporting events and concerts, primarily in Michigan, well in excess of the tickets' face value, in apparent violation of the Michigan Penal Code section that bars and punishes ticket scalping. *See* Mich. Comp. Laws § 750.465. For example, Plaintiff sold a $70.00 ticket to a Phoenix Coyotes versus Detroit Red Wings professional hockey game on February 25, 2001, at Joe Louis Area in De-troit, Michigan, for $210.00, of which $130.00 was for Plaintiff's "service charge" and $10.00 was for a non-cash transaction fee, according to a Plaintiff invoice dated February 2, 2001. *See* Schwartz (Pl.) Decl. Ex. 3 at 10. Plaintiff's "service charge" fluctuates. According to that same invoice, Plaintiff charged $183.75 for a $70.00 ticket to Toronto Maple Leafs versus Detroit Red Wings game on February 8, 2001, at Joe Louis Arena, of which $105.00 was for the "service charge" and $8.75 was for the non-cash transaction fee. *See id. See also, e.g.,* Schwartz Decl. Exs. 3–4.

Prior to October 2000, Plaintiff did business as BIG TEN WORLDWIDE. However, the Big Ten Conference, which is a nonprofit intercollegiate athletic conference (consisting of eleven member schools: Indiana University, Michigan State University, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University of Illinois, University of Iowa, University of Michigan, University of Minnesota, and University of Wisconsin), filed a lawsuit against Plaintiff because, *inter alia,* Plaintiff's "business was of particular concern to [the Big Ten Conference] not only because it involved the sale of tickets to sporting events at member schools, but the sale of tickets at higher than face value." *See Big Ten Conf., Inc. v. Big Ten Worldwide Concert & Sport Club at Town Ctr., LLC,* No. 96–70617, Docket Entry 117, at 3–4 (E.D.Mich. Oct. 10, 2000) (Hood, J.). The Big Ten Conference won the trademark suit, and Plaintiff was permanently enjoined from using the words BIG TEN or BIG 10 or any stylized version thereof. *See id.* at 33. Thereafter, Plaintiff began doing business as BIG TIME WORLDWIDE and using "bigtimeworldwide.com" as its Internet site.

Separately, Defendant's subsidiary, Marriott Ownership Resorts, Inc., which does business as, Marriott Vacation Club International ("MCVI"), began using the mark BIG TIME TICKETS in October 2001 in connection with ticket sales for theatrical shows and entertainment events that are localized to the area of Branson, Missouri, which is a vacation destination in the Ozark Mountains. Defendant also uses its mark to market vacation packages and to promote the sale of vacation ownership interests at MCVI resort properties within the Branson area.

Defendant utilizes the Internet domain name "bigtimetickets.com." This domain name was created by an individual named Larry Hamilton of Roswell, Georgia, on January 7, 2000, well before Plaintiff began doing business as BIG TIME WORLDWIDE. *See* Arlen (Def.) Decl. Ex. H. Mr. Hamilton transferred his ownership of this domain name to Defendant's agent on October 3, 2001. *See* Arlen Decl. at ¶ 10, Ex. I. Unlike Plaintiff's business practice on its Internet site, tickets sold under Defendant's mark *cannot* be obtained through the Internet or the mail; instead, Defendant's customers must actually come to the BIG TIME TICKETS retail building in Branson to acquire tickets. *See* Def. Br. at 3; Amico Decl. at ¶ 17.

Additionally, Defendant has secured Registration Number 2,631,928 for the mark BIG TIME TICKETS, which was issued by the United States Patent and Trademark Office ("PTO") on October 8, 2002. *See* Arlen Decl. Ex. A. The PTO published the mark for opposition on July 16, 2002, pursuant to 15 U.S.C. § 1062(a). Despite Plaintiff's knowledge of Defendant's mark, as evidenced by Plaintiff's cease and desist letter to Defendant on April 3, 2002, Plaintiff never filed a notice of opposition to Defendant's mark with the PTO, pursuant to 15 U.S.C. § 1063(a).

Instead, after acquiescing in the registration of Defendant's mark, Plaintiff filed the Complaint on November 5, 2002, alleging: Count I, false designation under 15 U.S.C. § 1125(a); Count II, unfair trade practices, Mich. Comp. Laws § 445.903; Count III, common law unfair competition; and Count IV, conversion. Plaintiff's state law claims are properly before this Court because all of the requirements of diversity jurisdiction, 28 U.S.C. § 1332, have been met. Plaintiff filed the present Motion with the Complaint. After Defendant filed a Response to the Motion on November 26, 2002, Plaintiff filed an Amended Complaint on December 4, 2002, adding Count V, which requests cancellation of the federal registration of Defendant's mark pursuant to 15 U.S.C. § 1119.

Plaintiff's Motion specifically requests an injunction to stop Defendant, Defendant's agents, and all others acting in concert with Defendant, from using all forms of BIG TIME TICKETS during the pendency of this litigation.

## III. LEGAL STANDARD

"When determining whether to issue a preliminary injunction, a district court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Marchwinski v. Howard,* 309 F.3d 330, 333 (6th Cir.2002) (internal quotations omitted) (quoting *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)).

"These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566,

573 (6th Cir.2002) (citing *United Food & Comm'l Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998)). Furthermore, "[a] preliminary injunction is an *extraordinary remedy* which should be granted *only* if the movant carries his or her burden of proving that the circumstances *clearly* demand it." *Overstreet*, 305 F.3d at 573 (emphasis added) (citing *Leary*, 228 F.3d at 739); *see also United States v. Overton*, 834 F.2d 1171, 1177 (5th Cir.1987) ("a preliminary injunction is a *drastic* remedy for which the movant has a *heavy* burden." (emphasis added)).

Additionally, a preliminary injunction can be denied if a plaintiff comes to equity with unclean hands. The doctrine of unclean hands "provides, generally, that a party seeking equity cannot obtain relief when the party is guilty of unconscionable conduct directly related to the matter of litigation." *Mich. Pork Producers v. Campaign for Family Farms*, 229 F.Supp.2d 772, 783–84 (W.D.Mich.2002) (citing *Performance Unlimited v. Questar Publ'rs, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995); *In re Prevot*, 59 F.3d 556, 561 (6th Cir.1995)). "Thus, the doctrine is to be applied 'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.' " *Performance Unlimited*, 52 F.3d at 1383 (quoting *N.W. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 78 L.Ed. 293 (1933))).

## IV. ANALYSIS

After carefully balancing the four preliminary injunction factors, the Court has determined that none of the four weigh in Plaintiff's favor and that the preliminary injunction should be denied. Further, the Court shall also deny the preliminary injunction because Plaintiff has come to this Court with unclean hands.

## A. PLAINTIFF DOES NOT HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

### 1. Trademark, Unfair Trade Practices, and Unfair Competition

### a. Lack of Priority

■ Plaintiff does not own a federally registered mark but lays claim to a common law mark. Thus, to address Plaintiff's claims against Defendant the Court "must first determine whether [Plaintiff] has a valid, protectable trademark interest." *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir.1999). At common law, ownership of a mark is obtained by priority of actual use, but such common law rights are often geographically limited. *See Allard Enters. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571–72 (6th Cir.2001) ("The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the *geographic area in which the mark is used.*" (emphasis added)). Further, where a junior user, such as Defendant, applies for federal registration, the extent of the territory of a senior user/nonregistrant, such as Plaintiff, "is frozen as of the date of actual registration to the junior user." *Id.* at 572.

In this case, there is no dispute that Plaintiff has priority with respect to the geographic areas of Ann Arbor Detroit, East Lansing, and Oakland County, Michigan, as evidenced by Plaintiff's numerous invoices for sporting and other events in those four locales. *See* Schwartz Decl. Ex. 3; Schwartz Suppmnt'l Decl. Ex. 8. The overwhelming predominance of these Michigan locales in Plaintiff's business, however, suggests a geographic limit to

Plaintiff's common law mark. The geographic limit of Plaintiff's mark is also supported by Plaintiff's Internet homepage, which prominently displays advertisements for just three sports teams, all of which hail from Michigan: University of Michigan Wolverines, Detroit Lions, and Detroit Red Wings. *See* Schwartz Decl. Ex. 2. Furthermore, Plaintiff has offered no evidence of doing business for sporting events or otherwise in Defendant's narrow and remote geographic area of Branson, Missouri. Although Plaintiff does provide a lone invoice for an event in Saint Louis, Missouri, *see* Schwartz Decl. Ex. 4 at 5, the Saint Louis area is not the Branson area.

■ Further, Plaintiff contends that it sells tickets and services to customers worldwide over the Internet. *See* Pl. Br. at 2. However, " 'trademark rights are not created by sporadic, casual, and nominal' " means. *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 359 (6th Cir.1998) (quoting *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 (2d Cir. 1974) (quoting *Clairol, Inc. v. Holland Hall Prods., Inc.*, 165 U.S.P.Q. 214, 217 (Trademark Tr. & App. Bd.1970))). Thus, the sporadic and casual use of marketing and selling tickets over the Internet as well as the sporadic, casual, and nominal use, if any, of Plaintiff's mark in the Branson area is insufficient to create a common law mark for the Branson area.

Taking all of these considerations in to account, Plaintiff has not shown a strong likelihood of establishing priority for its common law mark in the Branson area, and thus, has not shown a strong likelihood of success on the merits.

### b. Lack of Confusion

Furthermore, for Plaintiff to prevail on its trademark, unfair trade practices, and unfair competition claims, Plaintiff must prove that the purportedly infringing mark is likely to cause confusion in the minds of prospective customers. *See* 15 U.S.C. § 1125; *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir.2002); *Wynn Oil Co. v. American Way Service Corporation*, 943 F.2d 595, 604 (6th Cir.1991); *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 n. 1 (6th Cir. 1991). " 'The general concept underlying likelihood of confusion is that the public believe that the mark's owner sponsored or otherwise approved of the use of the trademark.' " *Gray*, 295 F.3d at 646 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988)).

The United States Court of Appeals for the Sixth Circuit has identified eight factors relevant to the likelihood of confusion inquiry: (1) strength of plaintiff's mark, (2) relatedness of the goods/services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Gray*, 295 F.3d at 646 (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982)).

"None of these factors is dispositive of a plaintiff's case; 'these factors are simply a guide to help determine whether confusion would be likely to result from simultaneous use of the two contested marks. They imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.' " *Gray*, 295 F.3d at 646 (quoting *Wynn Oil*, 839 F.2d at 1186).

In this case, however, none of eight factors favor Plaintiff. None of eight factors demonstrate that Defendant's use is likely to cause confusion in the minds of Plaintiff's prospective customers. Therefore,

Plaintiff does not have a strong likelihood of success on the merits.

### i. Strength of Plaintiff's Mark

■ "The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace. A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both. The stronger the mark, all else equal, the greater the likelihood of confusion." *Gray*, 295 F.3d at 646 (citing *Homeowners*, 931 F.2d at 1107).

Plaintiff argues that its mark is strong because its mark is an arbitrary mark. It is arbitrary, according to Plaintiff, in that the words BIG TIME are "in no way descriptive of tickets or ticket brokering services." Pl. Br. at 7. While it is true that arbitrariness is a sign of distinctiveness and, thereby, a sign of a mark's strength, *see id.* (citing 2 McCarthy, *Trademarks & Unfair Competition* §§ 11:02, 11:11–12 (4th ed.2002)), it is equally true that " 'the greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion.' Indeed, courts have found extensive third-party uses of a trademark to substantially weaken the strength of a mark." *Homeowners*, 931 F.2d at 1108 (quoting *Restatement of Torts* § 729 cmt. g (1938)) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60 (5th Cir.1980); *Empire Nat'l Bank v. Empire of Am. FSA*, 559 F.Supp. 650, 655 (W.D.Mich. 1983)).

In *Homeowners*, the Sixth Circuit found that a mark's lack of strength was indicated by "numerous third-party registrations of the mark ..., either alone or in conjunction with other words or designs, in the U.S. Patent and Trademark Office and in various states." 931 F.2d at 1108.[1]

---

1. *See also Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1330 (Fed.Cir.1999) ("MAGNA/MAGNI prefix as well as the VISION suffix enjoy wide use in the eyeglass industry on similar goods and services.... [such] common usage of these descriptive terms weighs strongly against a finding of likelihood of confusion." (citing *Sun Banks of Fla., Inc., v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981)) ("We find the extensive third-party use of the word 'Sun' impressive evidence that there would be no likelihood of confusion between Sun Banks and Sun Federal." (citing *Amstar*, 615 F.2d 252 (72 third-party registrations of the mark DOMINO); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.1979) (multiple uses of the mark WORLD); *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir.1974) (multiple uses of the mark HERITAGE); *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445 (5th Cir.1973) (multiple uses of the mark HOLIDAY); *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721 (5th Cir.1954) (27 third-party registrations of the mark CHICO, EL CHICO and other similar names)))); *Streetwise Maps v. Vandam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998) (" 'Streetwise' is not particularly distinctive in the marketplace. Other map manufacturers have used the word 'street' in their product's names.... Moreover, a trademark search revealed the extensive use of the words 'street' and 'wise' in names registered by manufacturers of other products. Such third party use of the words 'street' and 'wise' weakens the strength of Streetwise's mark." (citing *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir. 1991) ("Extensive third party use of the words 'Choice' and 'Choices' weighs against a finding that [plaintiff's] trade name is strong.")); *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983) (extensive third-party use of the word PLUS demonstrated a weak mark; *Taj Mahal Enters., Ltd. v. Trump*, 742 F.Supp. 892, 897 (D.N.J.1990) (extensive third-party use of the words TAJ MAHAL demonstrated a weak mark); *McKee Baking Co. v. Interstate Brands Corp.*, 738 F.Supp. 1272, 1275 (E.D.Mo.1990) (extensive third-party use of the word LITTLE demonstrated unlikely confusion between LITTLE DEBBIE and LITTLE DOLLIES)).

Similarly here, Defendant has produced information from the PTO showing all live applications and registrations for marks containing the words "big time." *See* Arlen Decl. at ¶ 11. According to this information from the PTO's database, there are *at least* twenty-one other users of "big time" for a wide variety of products:

1. Bigtime (planning software)
2. Bigtime (piano publications)
3. Big Time (game software)
4. Big Time (watches, clocks)
5. Big Time (model race car systems)
6. Big Time (vehicle headlights, fog lights)
7. Big Time (toys)
8. Big Time (fruit drink)
9. Big Time (clothing)
10. Big Time (records, tapes)
11. Big Time Boat Shows (trade show organization)
12. Big Time Diner (restaurant)
13. Big Time Fun (entertainment, indoor amusement)
14. Big Time It (restaurant)
15. Big Time Movie (gaming machines, video games)
16. Big Time Productions (advertising consultants)
17. Big Time Talent (theatrical casting directory)
18. Big Times (newspapers)
19. Big Times Pay (slot machines)
20. The Big Time (basketball camp)
21. The Big Time (golf club shaft)

Arlen Decl. Ex. J. This evidence indicates that marks consisting of or containing the words "big time" are used extensively by many others in the marketplace and suggests that Plaintiff's mark lacks distinctiveness and, thereby, lacks strength. *See Homeowners*, 931 F.2d at 1108. As Professor J. Thomas McCarthy's treatise states: "It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." 2 McCarthy, *Trademarks* § 11:85. Thus, this factor weighs against Plaintiff.

### ii. Relatedness of the Goods/Services

■ There are generally three categories regarding the relatedness of the goods or services: "First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely." *Therma–Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632–33 (6th Cir.2002) (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir.1997)). In this case, Plaintiff argues that its services and Defendant's services are in direct competition. However, in reality, the evidence strongly shows that Plaintiff's services and Defendant's services are either somewhat related, but not competitive, or are totally unrelated. Therefore, this factor does not advance Plaintiff's likelihood of confusion claims.

On the surface, Plaintiff and Defendant are both in the same broad ticket industry, but "services are not necessarily related ... simply because they 'coexist in the same broad industry.' " *Therma–Scan*, 295 F.3d at 633 (quoting *Homeowners*, 931 F.2d at 1109).

Further, a closer look at their respective services indicates that Plaintiff and Defendant are not in competition. The seminal use of Plaintiff's mark is apparent ticket scalping: in exchange for providing a customer with scarce tickets, Plaintiff charges an exorbitant premium for the tickets far in excess of face value. *See, e.g.,* Schwartz

Decl. Ex. 2 (Plaintiff's Internet advertisement: "Millions of fans want to be [at the Super Bowl;] however, the [National Football League] only releases under a few hundred tickets to the general public. Those are distributed by a lottery and your chances of actually getting tickets to this event are slim to none. But don't despair! Big Time is here to help." Then Plaintiff lists costs for the 2003 Super Bowl ranging from $2,000 to $5,000 per ticket); *see also* Schwartz Decl. Exs. 3–4; *supra* Part II of this Order. Moreover, Plaintiff uses its mark primarily for sporting events, *see* Schwartz Decl. Exs. 2–4; Schwartz Suppmnt'l Decl. Ex. 8, and predominately for events in Michigan, *see* Schwartz Decl. Exs. 2–3; Schwartz Suppmnt'l Decl. Ex. 8.

In stark contrast, Defendant has never used its mark for sporting events or for any events outside the Branson area. Rather, Defendant uses its mark for theatrical shows in Branson. Defendant also uses its mark to market vacation packages and vacation ownership interests within the Branson area.

The dissimilarity of the services is amplified by a comparison of Plaintiff's and Defendant's Internet homepages. Plaintiff's homepage is dominated by words and images of football, hockey, automobile racing, baseball, basketball, golf, and tennis. *See* Schwartz Decl. Ex. 2. Defendant's homepage is oriented toward Branson and only Branson; e.g., near the top of Defendant's homepage are the words "Think Branson" in large italic letters. *See* Def. Resp. to Order for Docs. Further, Plaintiff's homepage is unmistakably geared toward Internet sales; for example, it contains the customary shopping cart image

and the words "view cart" and "checkout" at the very top of the page. *See* Schwartz Decl. Ex. 2. On the other hand, customers cannot purchase tickets on Defendant's Internet site; instead, customers must actually go to Defendant's building in Branson to acquire tickets. *See* Amico Decl. at ¶ 17; Def. Resp. to Order for Docs. In short, for Plaintiff, the Internet its part of its product, but for Defendant, the Internet is merely an ancillary means of attracting and informing customers and is not part of its product.

Given these substantial differences in their services and especially their Internet sites, it is clear that Plaintiff's and Defendant's prospective customers are extremely different. As a result, if a prospective customer for Plaintiff's service, who is seeking hard-to-get football tickets for a game in Ann Arbor, for example, happens upon Defendant's homepage, he is unlikely to be confused; rather, he will see all the trappings of Branson, Missouri, and quickly realize he is in the wrong place. Additionally, the inability to purchase tickets through the Internet will further confirm to the customer that Defendant's site does not have what he wants. *See Therma–Scan,* 295 F.3d at 633 (despite the fact that the parties offered goods and services that utilized similar technology, both used the technology in very different ways; thus, the minor similarities were insufficient to establish that the products were related for the purpose of determining whether a likelihood of confusion exists); *Homeowners,* 931 F.2d at 1109 (finding that firms "operat[ing] at different levels in the broad real estate industry and *sell[ing] to two completely distinct sets of buyers* " are not similar services) (emphasis added);[2]

---

**2.** *See also Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1205–06 (1st Cir.1983) (use of ASTRA blood analyzer laboratory instrument and use of ASTRA drugs in the health care field held not to be similar goods); *Federated Foods, Inc. v. Ft.*

*Howard Paper Co.,* 544 F.2d 1098 (Cust. & Pat.App.1976) (HY–TOP plastic bags, aluminum foil, and sponges held not to be similar to HY–TEX toilet tissue where the only link

*cf. Teletech Customer Care Mgmt. (Cal.), Inc. v. Tele–Tech Co.,* 977 F.Supp. 1407, 1414 (C.D.Cal.1997) (initial confusion on the part of an Internet user is insufficient to demonstrate likelihood of confusion: "This brief confusion is not cognizable under the trademark laws."); *Northland Ins. Cos. v. Blaylock,* 115 F.Supp.2d 1108, 1119–21 (D.Minn.2000) (rejecting plaintiff's argument that there was a likelihood of confusion simply because both parties' Internet sites were on the Internet and both were vying for the attention of Internet users); *N. Light Tech., Inc. v. N. Lights Club,* 97 F.Supp.2d 96, 113 (D.Mass.2000) (following *Teletech* ).

Therefore, Plaintiff's services and Defendant's services associated with their respective marks are unlikely "to lead consumers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'" *Therma–Scan,* 295 F.3d at 633 (quoting *Homeowners,* 931 F.2d at 1109). Thus, Plaintiff's services and Defendant's services are not competitive and are arguably totally unrelated; thus, the similarity-of-services factor does not weigh in Plaintiff's favor.

### iii. Similarity of the Marks

█ Evaluating the similarity of the marks "entails more than a simple side-by-side comparison of the trademarks in question." *Therma–Scan,* 295 F.3d at 633 (citing *Homeowners,* 931 F.2d at 1109 ("in evaluating similarity of marks, 'it is axiomatic in trademark law that 'side-by-side' comparison is not the test.'" (quoting *Wynn Oil,* 839 F.2d at 1187))). Instead, the Court must inquire whether the mark, "when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Therma–Scan,* 295 F.3d at 633 (citing *Daddy's,* 109 F.3d at 283; *Homeowners,* 931 F.2d at 1109 ("A court must

was that both marks might be found in the

determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." (quoting *Wynn Oil,* 839 F.2d at 1187))). Thus, "a detailed analysis of specific features of a trademark is not appropriate; rather, '[the Court] must view marks in their entirety and focus on their overall impressions, not individual features.'" *Therma–Scan,* 295 F.3d at 633 (quoting *Daddy's,* 109 F.3d at 283).

While both marks uses the words BIG TIME, the marks, when viewed in their entirety, are noticeably dissimilar: BIG TIME WORLDWIDE and BIG TIME TICKETS. *See Luigino's, Inc. v. Stouffer Corp.,* 170 F.3d 827, 830–31 (8th Cir.1999) (LEAN'N TASTY did not infringe LEAN CUISINE for low-fat frozen food: " 'cuisine' and 'tasty' are not so alike in form, spelling, sound, and meaning that when used on identical goods, an ordinary consumer is likely to be confused or misled as to the difference between them."); *Colony Foods, Inc. v. Sagemark, Ltd.,* 735 F.2d 1336, 1339 (Fed.Cir.1984) (HUNGRY HOBO and HOBO JOE's for restaurants held not confusing: "the fact that both marks play on the hobo theme is not enough to make confusion likely, in light of the differences in the marks as a whole."). The situation might be different if Plaintiff was attempting to protect a mark that included the word TICKETS, such as BIG TIME TICKETS WORLDWIDE or even BIG TIME WORLDWIDE TICKETS, but it is not so attempting.

Further, Plaintiff's conduct shows that WORLDWIDE is an important and distinguishing part of what makes its mark its mark: when Plaintiff ceased using BIG TEN WORLDWIDE, it elected to retain the word WORLDWIDE in its mark. Moreover, customers know and respond to the WORLDWIDE name, as proven by

same area of the supermarket).

the admission of Plaintiff's owner in which he acknowledges that, when Plaintiff made the switch from BIG TEN WORLDWIDE to BIG TIME WORLDWIDE, Plaintiff "suffered virtually no drop-off in business." Schwartz Decl. at ¶ 6. Thus, BIG TIME WORLDWIDE and BIG TIME TICKETS are sufficiently dissimilar to make customer confusion in the marketplace unlikely. That is, a customer searching for BIG TIME WORLDWIDE can easily tell the difference from BIG TIME TICKETS.

Additionally, Plaintiff argues that "[e]ven the addition of Defendant's company trade name, MARRIOTT, i.e., its 'house mark,' as a suffix to some of its marks (BIG TIME TICKETS BY MARRIOTT VACATIONS), is insufficient to distinguish its mark from Plaintiff's [mark] and alleviate any likelihood of confusion." Pl. Br. at 8–9 (citing 3 McCarthy, *Trademarks* § 23:43 (examples: AL'S KENTUCKY FRIED CHICKEN infringed KENTUCKY FRIED CHICKEN; SPARKS BY SASSAFRAS for women's clothing infringed SPARKS shoes); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 351 (9th Cir.1980) (GOLDEN DOOR COIFFEUR and GOLDEN DOOR FOR HAIR infringed GOLDEN DOOR health and beauty spa)).

However, the examples cited by Plaintiff are distinguishable from this case because, unlike the situation here, the junior user in Plaintiff's examples adopted the senior user's identical mark. Here, Defendant has not adopted BIG TIME WORLDWIDE. Furthermore, the examples cited by Plaintiff are also distinguishable from this case because, in each example the junior user did not add a strong famous mark, as in this case with MARRIOTT, which is among the most well known marks in the United States. *See* Def. Br. at 14 (citing *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43 (2d Cir.2000)) (ICE BREAKERS and DENTYNE ICE so dissimilar that judgment for defendant was required without even examining all the likelihood of confusion factors: "prominent use of [defendant's] DENTYNE house mark significantly reduces, if not altogether eliminates, any likelihood of consumer confusion." (citing *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir.1992) ("The prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other [confusion] factors.")))); *Therma–Scan*, 295 F.3d at 634 (defendant's use of the BRAUN label on its products "diminishe[d] the likelihood of confusion created by the comparable marks and reduce[d] the importance of this factor."); *Taj Mahal Enters.*, 742 F.Supp. at 899 ("[T]he similarity between [TAJ MAHAL restaurant and TRUMP TAJ MAHAL] is mitigated to some extent by the inclusion of the almost singularly evocative surname Trump in TRUMP TAJ MAHAL."). Therefore, adding MARRIOTT to Defendant's mark further supports the conclusion that Plaintiff's mark and Defendant's mark are dissimilar, and thus, diminishes the likelihood of confusion. As a result, this factor does not weigh in Plaintiff's favor.

#### iv. Evidence of Actual Confusion

Plaintiff has conceded this factor; Plaintiff admits that it has no evidence of actual confusion. *See* Pl. Br. at 12–13 (citing, *inter alia, Daddy's*, 109 F.3d at 284 ("Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant.")). Thus, this factor does not favor Plaintiff.

#### v. Marketing Channels Used

■ This factor requires the Court to analyze "the parties' *predominant* customers and their marketing approaches." *Therma–Scan*, 295 F.3d at 636 (emphasis added) (citing *Homeowners*, 931 F.2d at

1110 (this factor "consists of considerations of how and to whom the respective goods or services of the parties are sold.")). "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases." *Therma–Scan,* 295 F.3d at 636 (citing *Homeowners,* 931 F.2d at 1110 (dissimilarities between the parties' customers and their methods of marketing their products reduces the likelihood of confusion)).

The Court has already explained, in discussing the similarity-of-services factor, that Plaintiff's customers and Defendant's customers are extremely different. *See supra* Part IV.A.1.b.ii of this Order. To summarize, Plaintiff's predominate customers are seeking scarce tickets to sporting or other events primarily in Michigan, while, on the other hand, Defendant's predominate customers are interested in theatrical tickets and vacation related services exclusively in the area of Branson, Missouri. Such dissimilarities show the unlikelihood of confusion.

In addition, Plaintiff argues that since both parties market their products over the Internet this factor favors Plaintiff. However, a general "reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory." *Therma–Scan,* 295 F.3d at 637. Instead, to determine whether use of the Internet is evidence that the parties utilize similar marketing channels, "the relevant questions include: (1) 'whether both parties use the [Internet] as a substantial marketing and advertising channel,' (2) 'whether the parties' marks are

utilized in conjunction with [Internet]-based products,' and (3) 'whether the parties' marketing channels overlap in any other way.'" *Therma–Scan,* 295 F.3d at 637 (quoting *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1151 (9th Cir.2002)).

Here, even if both parties engaged in substantial marketing and advertising over the Internet, this factor does not weigh in Plaintiff's favor because while Plaintiff has an Internet-based product (i.e., Internet sales of tickets), Defendant does not have an Internet-based product. *See Therma–Scan,* 295 F.3d at 637. Rather, as articulated *supra,* Defendant's mark appears on the Internet as merely an ancillary means of attracting and informing customers and is not part of its product, i.e., Defendant does not sell tickets on the Internet. *See supra* Part IV.A.1.b.ii of this Order. Additionally, there appears to be no overlap of non-Internet marketing channels: unlike Defendant, Plaintiff has not, *inter alia,* sent out some 125,000 direct mail pieces in the Branson area, has not distributed promotional materials at Branson hotels, has not advertised on Branson-area cable networks and in Branson-area newspapers, and has not built an eye-catching sign and brick-and-mortar building with the BIG TIME TICKETS mark in Branson. *See* Def. Br. at 3–6; Amico Decl. at Exs. B–C. Thus, the parties' marketing channels are not significantly similar. *See Therma–Scan,* 295 F.3d at 637.

Finally, Plaintiff argues that its customers, intending to find Plaintiff's Internet site, may accidently happen upon Defendant's site [3] and be confused. This argument is without merit. To emphasize a prior example, *see supra* Part IV.A.1.b.ii of

---

**3.** Note that customers searching for the BIG TIME WORLDWIDE mark are not being directed to Defendant's Internet site. Further, customers searching the BIG TIME WORLDWIDE mark are not accidently happening upon Defendant's site, as demonstrated by Internet searches provided by Defendant. *See* Arlen Decl. Exs. C–D. Rather, the only customers who may potentially happen upon Defendant's site by accident are those who are not fully aware of the BIG TIME WORLDWIDE mark.

this Order, because of the substantial differences in the parties' services and their Internet sites, if a prospective Plaintiff customer, who is seeking hard-to-get football tickets for a game in Ann Arbor, happens upon Defendant's homepage, he is unlikely to be confused. Rather, once he sees the Branson-focus of Defendant's site and realizes that Defendant's site does not enable him to purchase tickets through the Internet, he will quickly ascertain that he is in the wrong place. Alternatively, even if some momentary confusion were to occur, such brief confusion on the part of an Internet user is insufficient to prove likelihood of confusion. *See Teletech,* 977 F.Supp. at 1414 ("This brief confusion [of an Internet-user] is not cognizable under the trademark laws."); *Northland,* 115 F.Supp.2d at 1119–21 (same); *N. Light,* 97 F.Supp.2d at 113 (same); *supra* Part IV. A.1.b.ii of this Order. Consequently, this factor does not favor Plaintiff.

### vi. Likely Degree of Purchaser Care

The standard for determining whether an ordinary buyer "would differentiate between products with similar trademarks is the exercise of ordinary caution." *Therma–Scan,* 295 F.3d at 638. "A higher degree of care, in contrast, is appropriate where the buyer in question has a particular expertise or sophistication, or is making an expensive or unusual purchase." *Id.* (citing *Homeowners,* 931 F.2d at 1111). This expectation of greater care, diminishes the likelihood of confusion. *See Therma–Scan,* 295 F.3d at 638 (citing *Homeowners,* 931 F.2d at 1111 ("When services are sold to such buyers, other things being equal, there is less likelihood of confusion.")).

■ As noted above, Plaintiff resells tickets to events such as the Super Bowl at a cost of $2,000 to $5,000 per ticket. *See* Schwartz Decl. Ex. 2 (discussing cost and scarcity of Super Bowl tickets); *supra* Part IV.A.1.b.ii of this Order. Thus, contrary to Plaintiff's argument that its customers lack sophistication, *see* Pl. Br. at 12, customers making such an expensive and unusual purchase are likely to exercise a greater degree of care, thereby reducing the likelihood of confusion. *See Homeowners,* 931 F.2d at 1111. Moreover, the Court agrees with Defendant that "persons considering the purchase of tickets at inflated prices from an entity like [Plaintiff] are likely to investigate its identity to avoid the risk of being defrauded." Def. Br. at 15. Accordingly, this factor does not favor Plaintiff.

### vii. Defendant's Intent in Selecting the Mark

■ Where, as here, "there is no evidence that the defendant actually knew that a protected trademark existed, such knowledge can be presumed if evidence exists of the plaintiff's 'extensive advertising and long-term use of a protected mark.' " *Therma–Scan,* 295 F.3d at 639 (quoting *Daddy's,* 109 F.3d at 286). Plaintiff has not alleged that Defendant intentionally began using Plaintiff's mark, and Defendant has adequately shown that it adopted BIG TIME TICKETS in good faith, i.e., it had no knowledge of BIG TIME WORLDWIDE when it began using its mark. *See* Def. Br. at 15; Amico Decl. at ¶¶ 4–8. Further, there is not even the slightest indication that Plaintiff conducted an "extensive advertising" campaign. Moreover, Plaintiff only began doing business as BIG TIME WORLDWIDE very recently, in October 2000. Thus, knowledge of Plaintiff's mark cannot be presumed. *See Therma–Scan,* 295 F.3d at 639.

Plaintiff further argues that Defendant should have known of Plaintiff's mark. Obtaining such knowledge is difficult when an unregistered, common law mark, such as Plaintiff's mark, is at issue. Neverthe-

less, Defendant states that it "conducted a comprehensive search of federal, state, and common law marks as well as [Internet] domain names and [Plaintiff's mark] did not appear in this search." Def. Br. at 15. This inability to find Plaintiff's unregistered, common law mark is reasonable given the fact that Defendant's mark of BIG TIME TICKETS is substantially dissimilar from BIG TIME WORLDWIDE. *See supra* Part IV.A.1.b.iii of this Order. Therefore, this factor does not favor Plaintiff.

### viii. Likelihood of Expansion of the Product Lines

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's,* 109 F.3d at 287 (quoting *Homeowners,* 931 F.2d at 1112). Plaintiff did not advance an argument addressing this forward-looking factor because Plaintiff believes that its services and Defendant's services are already in direct competition. *See* Pl. Br. at 12. "Absent some showing by Plaintiff, the Court cannot conclude that this factor indicates a likelihood of confusion." *R.L. Polk & Co. v. INFOUSA, Inc.,* 230 F.Supp.2d 780, 795–96 (E.D.Mich. 2002) (Gadola, J.). Nevertheless, even if Plaintiff was able to successfully marshal enough proof to tip this factor in its favor, it is but one factor among eight, with the other seven disfavoring Plaintiff. *See Gray,* 295 F.3d at 646 ("None of these factors is dispositive of a plaintiff's case.").

In sum, Plaintiff has not come even close to proving that there is a likelihood of confusion between the marks. Therefore, Plaintiff does not have a strong likelihood of success on the merits of its trademark, unfair trade practices, and unfair competition claims.

### 2. Conversion

"Under Michigan law, conversion is defined generally as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" *Murray Hill Publ'ns, Inc. v. ABC Commctns., Inc.,* 264 F.3d 622, 636–37 (6th Cir.2001) (quoting *Sarver v. Detroit Edison Co.,* 225 Mich.App. 580, 585, 571 N.W.2d 759, 761 (1997)).

Plaintiff argues that Michigan law allows claims for conversion of trademarks. In support of this argument, Plaintiff relies on *Sarver v. Detroit Edison Company,* 225 Mich.App. 580, 571 N.W.2d 759. The *Sarver* case, however, held that an idea, by itself, was not actionable under Michigan conversion law. 225 Mich.App. at 586–90, 571 N.W.2d at 762–64. Further, while *Sarver* stated that "Michigan appellate courts have held that certain intangible property can be the subject of a conversion action," none of the examples cited in *Sarver* involved trademarks. *Id.* (citing *Miracle Boot Puller Co. v. Plastray Corp.,* 57 Mich.App. 443, 451, 225 N.W.2d 800, 804 (1975) (patent); *Tuuk v. Andersen,* 21 Mich.App. 1, 13, 175 N.W.2d 322, 327–28 (1969) (right to lease a machine); *Warren Tool Co. v. Stephenson,* 11 Mich.App. 274, 276, 161 N.W.2d 133, 136 (1968) (negotiable instrument)). Thus, Plaintiff has not cited, and the Court is not aware of, any case in which a court has recognized, or a plaintiff has recovered on, a Michigan conversion claim in the context of trademark infringement. On the other hand, Defendant has cited cases in which federal district courts have refused to recognize trademark conversion claims: *Neles–Jamesbury, Inc. v. Bill's Valves,* 974 F.Supp. 979 (S.D.Tex.1997) (rejecting claim for conversion of trademark under Texas law); *Liebowitz v. Maxwell,* No. 91–4551, 1994 WL 517456, at *1 (S.D.N.Y.

Sept. 21, 1994) (dismissing claim for conversion of trademark under Maryland law). *See also Fin. Matters, Inc. v. Pepsico, Inc.*, No. 92–7497, 1993 WL 378844, at *1 (S.D.N.Y. Sept. 24, 1993) (dismissing claim for conversion of trademark under New York law). Thus, the Court is not persuaded that the Michigan courts' recognition of claims for conversion of intangible property extends to trademarks.

Alternatively, even if Plaintiff's conversion claim was actionable under Michigan law, Plaintiff is unable to prove common law conversion in two respects. First, since Defendant is not using Plaintiff's BIG TIME WORLDWIDE mark, Defendant has not exerted dominion over Plaintiff's personal property. *See Murray Hill*, 264 F.3d at 636. Moreover, Plaintiff has not cited any authority to support the contention that a defendant can be held liable for conversion as a result of exerting dominion over his personal property that happens to be "substantially similar" to the plaintiff's personal property. *See* Pl. Br. at 14. Second, insofar as Plaintiff is unlikely to succeed on the merits of its trademark, unfair trade practices, and unfair competition claims, *see supra* Part IV.A.1 of this Order, Plaintiff is equally unlikely to prove that Defendant's conduct was wrongful for the purposes of the conversion claim. *See Murray Hill*, 264 F.3d at 636. Accordingly, Plaintiff does not have a strong likelihood of success on the merits of its conversion claim.

## B. PLAINTIFF WOULD NOT OTHERWISE SUFFER IRREPARABLE INJURY

■ "In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm." *Wynn Oil*, 943 F.2d at 608. Here, Plaintiff's entire irreparable injury argument rests on its mistaken belief that there is a likelihood of confusion between Plaintiff's mark and Defendant's mark.

*See* Pl. Br. at 14; *supra* Part IV.A.1 of this Order. Consequently, since the likelihood of confusion is not present, the irreparable-injury factor does not favor Plaintiff. *See Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir.1999) ("The law of this Circuit holds that no particular finding of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." (citing *Wynn Oil*, 943 F.2d at 608)); *Lever Bros. Co. v. Mattel, Inc.*, 609 F.Supp. 1395, 1403 (S.D.N.Y.1985) ("Plaintiff's failure to show a likelihood of confusion means that he also lacks a likelihood of success on the merits and has failed to demonstrate irreparable harm."); *Empire Nat'l Bank*, 559 F.Supp. at 657 (failure to show likelihood of confusion resulted in failure to show irreparable injury).

As a result, the Court need not address whether Plaintiff's delay in seeking a preliminary injunction weighs against a finding of irreparable harm. *See* Def. Br. at 9–10; *R.L. Polk*, at 796 (" 'Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.' " (quoting *Blockbuster Entm't Group v. Laylco, Inc.*, 869 F.Supp. 505, 516 (E.D.Mich.1994) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275–76 (2d Cir.1985)))).

## C. ISSUANCE OF A PRELIMINARY INJUNCTION WOULD CAUSE SUBSTANTIAL HARM TO DEFENDANT AND OTHERS

■ Issuance of a preliminary injunction in this case would cause substantial harm to Defendant. Plaintiff is asking the Court to "immediately enjoin" Defendant from using any form of the BIG TIME

TICKETS mark. Pl. Br. at 15. Such an injunction would require Defendant, *inter alia*, to tear down a significant portion of its retail building in Branson. The facade of Defendant's building includes a large sign on which the BIG TIME TICKETS mark is displayed as an integral feature. *See* Def. Br. at 3; Amico Decl. Ex. B. This facade cost approximately $220,000. *See* Def. Br. at 3; Amico Decl. at ¶ 15. The destruction of this building alone is enough to counsel against issuing the preliminary injunction.

However, beyond the building, Defendant has also invested substantial sums in signage, merchandise, and other materials bearing Defendant's mark. *See* Def. Br. at 3–4, 16; Amico Decl. at ¶¶ 9–38. These investments, including the building's facade, exceed $500,000. *See* Def. Br. at 16. Further, Defendant has spent substantial sums, in excess of $300,000, in advertising and promoting its mark in the Branson area via, *inter alia*, billboards, direct mail, local cable networks, local newspapers, hotel keys, and even plastic bottles of root beer bearing the BIG TIME TICKETS mark. *See* Def. Br. at 3–5, 16; Amico Decl. at ¶¶ 9–38. Defendant is likely to suffer immeasurable harm if its expenditures in furtherance of the BIG TIME TICKETS mark were to be nullified as the result of a preliminary injunction. Further, the cost of implementing a new mark would be substantial.

Moreover, beyond Defendant, other Branson-area businesses would be substantially harmed. Other businesses in Branson are also using Defendant's mark in connection with joint promotions. *See* Def. Br. at 16; Amico Decl. at ¶¶ 25–29. Defendant has agreements with some eighteen hotels in the Branson area concerning a gift certificate promotion. *See* Def. Br. at 4; Amico Decl. at ¶¶ 25–29. Like Defendant, the injunction would disrupt the flow of income to these other businesses in a way that cannot be quantified.

This substantial harm to Defendant and others outweighs the harm, if any, that Plaintiff, with its small staff of fifteen, will suffer as a result of the injunction not being issued. *See* Schwartz. Suppmnt'l Decl. at ¶ 8. Thus, the substantial harm to Defendant and others strongly weighs in favor of preserving the status quo pending the final outcome of this litigation.

## D. THE PUBLIC INTEREST WOULD NOT BE SERVED BY ISSUANCE OF A PRELIMINARY INJUNCTION

 The public interest would not be served by the issuance of a preliminary injunction in a civil action where, such as here, there is no likelihood of confusion between the two marks at issue and where a party, such as Plaintiff, is unlikely to prevail on the merits. *See supra* Part IV.A of this Order. *See also infra* Part IV.E of this Order. Thus, none of the four preliminary injunction factors weigh in Plaintiff's favor.

## E. PLAINTIFF HAS UNCLEAN HANDS

 Additionally, "the complainant must come into equity with clean hands." *Clarke v. White*, 37 U.S. 178, 193, 12 Pet. 178, 9 L.Ed. 1046 (1838); *see also ABF Freight Sys. v. Nat'l Labor Relations Bd.*, 510 U.S. 317, 329–30, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) ("The 'unclean hands' doctrine 'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" (quoting *Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (denying relief due to perjury))).

As discussed throughout this Order, Plaintiff is an apparent ticket scalper. Plaintiff sells tickets to sporting and other events well in excess of the tickets' face value, in apparent violation of the Michigan Penal Code section that "protects the public from the predatory practices of ticket brokers who charge greatly inflated prices for tickets which would otherwise be available to the public at regular box office prices." *People v. Trabucchi*, 160 Mich. App. 792, 797, 408 N.W.2d 563, 564–65 (1987); Mich. Comp. Laws § 750.465. Plaintiff has provided the Court with dozens of its invoices, which reveal how it charges, *inter alia*, $105, $112, $120, $130, $132, $135, $140, $154, $155, $163, $172, $175, $179, $180, $188, $200, $205, $225, $260, $280, $309, $359, $385, $450, $509, $830, and $1,030 over face value for a single ticket with no hint of permission from the original ticket issuer. *See* Schwartz Decl. Exs. 3–4.[4] Plaintiff dresses up these overcharges as Plaintiff's "service charge," which appears to fluctuate with ticket demand. *See supra* Part II of this Order (noting that Plaintiff charged both a $130 and $105 "service charge" on the same invoice for similar $70 tickets for hockey games on different dates with different Red Wing opponents).

Plaintiff has also demonstrated to the Court that it is conscious of its unconscionable conduct. After Defendant accused Plaintiff of ticket scalping in Defendant's Response to Plaintiff's Motion, Plaintiff filed a Supplemental Declaration in which Plaintiff included dozens of additional invoices. *See* Schwartz Suppmnt'l Decl. Ex. 8. The glaring difference between the first set of invoices, which were filed with Plaintiff's Motion, and the second set of invoices is that Plaintiff removed or blocked-out the face value ticket prices from the second set

of invoices. *Compare* Schwartz Decl. Exs. 3–4, *with* Schwartz Suppmnt'l Decl. Ex. 8. As a result, the Plaintiff's overcharges in the second set are undeterminable. Covering up such incriminating evidence is an admission of unconscionable conduct.

Plaintiff's owner counters the scalping charges by arguing that he runs a "legitimate" business:

> In the Big Ten case, we presented testimony on our behalf of a Michigan District Court judge, who is a long-time customer of ours. I have also been expressly told by numerous members of the Oakland County prosecutor's office that my operations are within the letter of the law. Even Judge Hood, on page 25 of her opinion in the Big Ten case, made it clear that "there has been no finding that [Plaintiff] engaged in ticket scalping."

Schwartz Suppmnt'l Decl. at ¶ 9.

First, a state court judge's extracurricular conduct is insufficient to cleanse Plaintiff's hands here. Second, as to the *Big Ten* case, the owner's argument is disingenuous. Judge Hood's full statement paints Plaintiff in a very different, and less becoming, light:

> The Court finds that [the Big Ten's] mark has been diluted through tarnishment. Michigan law prohibits ticket scalping. Although there has been no finding that [Plaintiff] has engaged in ticket scalping, there is no dispute that Defendant obtains its tickets to sporting events, which include Big Ten events, from individuals who wish[ ] to resell their tickets. The association of [the Big Ten's] mark with this type of business tarnishes [the] Big Ten's image as a sponsor of collegiate sporting events

---

4. These examples do not include Plaintiff's five percent non-cash transaction fee. *See*

Schwartz Decl. Exs. 3–4.

and a promoter of good sportsmanship. [The Big Ten's] concern that its mark not be associated with an enterprise that re-sell[s] tickets is a legitimate concern. The Court does not find that [the Big Ten] has exaggerated the harm from [Plaintiff's] use of the mark. Unlike [*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497 (2d Cir.1996),] cited by [Plaintiff], there is a negative association with [the Big Ten's] mark to [Plaintiff's] business of reselling tickets to sporting events.

*See Big Ten Conf.*, No. 96–70617, Docket Entry 117, at 25. *See also id.* at 3 n. 1 (ticket scalping not at issue in the *Big Ten* case); *id.* at 3–4 (Big Ten concerned about Plaintiff reselling its member schools' tickets at higher than face value). Determining whether Plaintiff was a ticket scalper was not necessary to the resolution of the *Big Ten* case. Thus, at best, the *Big Ten* case is a nullity in this determination of unclean hands.

Finally, as to the purported blessings from the employees of the Oakland County prosecutor's office, Plaintiff's practice of using the words "service charge" in an attempt to thinly disguise its overcharges may be enough to help it evade prosecution for ticket scalping. This Court, however, can plainly see that the emperor has no clothes. A plaintiff, moreover, need not be a criminal to have unclean hands.

If the preliminary injunction were to issue, it would facilitate and ratify Plaintiff's unconscionable acts of apparent ticket scalping. Therefore, since Plaintiff has engaged in unconscionable acts that have an immediate and necessary relation to the equitable relief requested by Plaintiff in this litigation, the doctrine of unclean hands shall bar the issuance of a preliminary injunction. *See Performance Unlimited*, 52 F.3d at 1383. The imprimatur of this Court shall not be used to advance such unconscionable conduct.

## V. CONCLUSION

ACCORDINGLY, IT IS HEREBY OR-DERED that Plaintiff's Motion for a Preliminary Injunction [docket entry 2] is DE-NIED.

IT IS FURTHER ORDERED that the hearing on this Motion, scheduled for January 13, 2002, is CANCELLED.

SO ORDERED.